Richard LEWIS, Plaintiff,

v.

Robert ELLIOTT, et al., Defendants.

Civ. A. No. 84–3603.

United States District Court,
District of Columbia.

Jan. 17, 1986.

Joan M. Wilbon, Washington, D.C., for plaintiff.

Charles C. Bowie, Annapolis, Md., James C. Gregg, Washington, D.C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

This action involves a claim of defamation by plaintiff Richard Lewis against three defendants: National Capitol Systems, Inc., Rehab, Inc., and Robert Elliott. Plaintiff was employed at the Department of Health and Human Services (DHHS) for over nineteen years. At the time of the incident in question, plaintiff was a GS–14 and his title was Chief of the Software Management Branch, Division of Data Processing. Part of his job was to oversee work performed by companies that contracted with DHHS to ensure that the work was being performed according to the scope of work which was prepared for it. On or about August, 1983, defendant Robert Elliott was installed by defendant Rehab, a corporation that contracted with

DHHS, as its interim project manager. It was part of plaintiff's job to oversee the work done by defendant Rehab and managed by defendant Elliott. Thus plaintiff and defendant Elliott had frequent contact, contact which the evidence at trial indicated was frequently marked by tension between the two.

The communications at issue in this case arose from DHHS's search for a company to take over Rehab's contract. Rehab's contract with DHHS was to expire on September 30, 1983, and Rehab was not eligible to renew it. DHHS solicited bidders and chose a firm unrelated to Rehab, Capital Systems, Inc., to assume the contract. On December 14, 1983, defendant National Capitol Systems, a firm unrelated to either Rehab or Capital Systems and an unsuccessful candidate for the contract recently awarded by DHHS, initiated a bid protest letter to Margaret Heckler, Secretary of DHHS, claiming that plaintiff had violated a provision of the Ethics in Government Act, 18 U.S.C. § 208(a) by considering an offer of employment with Capital Systems, the successful bidder. Attached to the bid protest letter was an affidavit prepared by defendant Elliott stating that Lewis had told him that Capital Systems had made Lewis a very good offer and that it would take a salary of $58,000 per year to top the offer he had received from Capitol Systems. Plaintiff's Exhibit F. National Capitol Systems had heard through Elliott's superior at Rehab that Elliott would be willing to make such a statement about plaintiff. National Capitol Systems also sent a second letter on December 29, 1983, reasserting its claim. An internal investigation ensued after which plaintiff was cleared of any wrong-doing. Plaintiff nevertheless claimed that he suffered physical and psychological duress and loss of future income because of the alleged defamatory publication.

The case proceeded to trial on October 7, 1985, and on October 10, 1985, went to the jury to decide all issues except plaintiff's prayer for punitive damages which the Court ruled the jury could not award. The jury was given a bifurcated verdict form in which it was first asked to determine whether any statements in the bid protest letter or the attached affidavit were false. The jury answered "Yes." Verdict Form (filed Oct. 10, 1985). The jury was then asked to find whether any of the false statements, read in context, were defamatory. Again the jury found that they were. *Id.* Finally, the jury was asked to determine by a preponderance of the evidence if any of the defendants had acted with malice, defined as personal ill will, spite, hostility, or a deliberate intent to harm the plaintiff in making the false and defamatory statement or statements. Standardized Civil Jury Instructions for the District of Columbia (D.C. Jury Instructions) 17-13 (rev. ed. 1985). As to defendants Elliott and Rehab, the jury answered "Yes." *Id.* As to defendant National Capitol Systems, the jury answered "No." *Id.* Thus the jury exonerated defendant National Capitol Systems and found defendants Elliott and Rehab liable for the alleged defamation. The jury verdict announced against defendants Rehab and Elliott was in the amount of $475,000. *Id.* This action is now before the Court on defendants Rehab and Elliott's Motions For Judgment Notwithstanding The Verdicts, And, In The Alternative, A New Trial (Defendants' Mem.) (filed October 18, 1985), and plaintiff's opposition thereto (filed Nov. 4, 1985).

## II.

In moving for a judgment notwithstanding the verdict, the same burden rests with defendants as when they moved for a directed verdict. *Vander Zee v. Karabatsos*, 589 F.2d 723, 726 (D.C.Cir.1978), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979). That is, a motion notwithstanding the verdict should not be granted unless the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable men could not disagree on the verdict. *Id.*

The standards for granting a judgment notwithstanding the verdict and new trial are distinct, the standard for a new

trial being less onerous. *National Car Rental System, Inc. v. Better Monkey Grip Co.*, 511 F.2d 724, 725 (5th Cir.), *cert. denied*, 423 U.S. 894, 96 S.Ct. 193, 46 L.Ed.2d 126 and 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). A trial judge should grant a new trial if the verdict is against the weight of the evidence, damages are excessive, for other reasons the trial was not fair, or substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions. 11 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 2805 (1973); *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940); *Baber v. Buckley*, 322 A.2d 265, 266 (D.C.App.1974).

In deciding whether to grant a new trial, the court should be mindful of the jury's special function in our legal system and hesitate to disturb its finding. *Milos v. Sea-Land Service, Inc.*, 478 F.Supp. 1019, 1021 (S.D.N.Y.1979), *affd. mem.*, 622 F.2d 574 (2d Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 219 (1980). Nevertheless, if the court after considering all the evidence and the jury's verdict is left with the "definite and firm conviction" that a mistake has been committed, it should grant a new trial. 11 Wright, Miller & Cooper, *supra*, at § 2806.

### A.

Defendants first argue that "there was nothing defamatory in connection with the Lewis case." Defendants' Mem. at 3. A defamatory statement is one "which tends to expose a person to scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." D.C. Jury Instruction 17–1; Prosser and Keeton on Torts 773 (5th ed. 1984); Restatement (Second) of Torts § 559 comment e (1965). There was evidence introduced at trial from which a jury could reasonably conclude that defendant Elliott prepared an affidavit stating that he had been told by plaintiff that plaintiff had a job offer from

the successful bidder for a DHHS contract, and that defendant knew this affidavit was to be attached to a bid protest letter alleging that plaintiff violated the Ethics in Government Act. Plaintiff's Exhibits F, G. The two communications assert that plaintiff breached an ethical duty imposed by his government job. Thus, when viewed according to all the circumstances surrounding publication there is ample basis for a jury finding that the communications are capable of a defamatory meaning. *See Olinger v. American Savings and Loan Assoc.*, 409 F.2d 142 (D.C.Cir.1969). Neither a new trial nor a judgment notwithstanding the verdict is justified on this ground.

### B.

Defendants next argue that the Court should have held that their conduct was protected by an absolute privilege. Absolute privilege attaches to statements made "preliminary to or in the course of a judicial proceeding" *Brown v. Collins*, 402 F.2d 209, 212 (D.C.Cir.1968) (quoting Restatement (Second) of Torts § 587). The purpose of the privilege is to protect the integrity of judicial proceedings by enabling participants "to state and support their positions without instilling a fear of retaliation, *i.e.*, an action for damages." *Sturdivant v. Seaboard Service System, Ltd.*, 459 A.2d 1058, 1060 (D.C.App.1983).

Defendants argue that the bid protest, and derivatively the attached affidavit now at issue, should be viewed as part of a judicial proceeding because the bid protest procedure was "an administrative proceeding within the United States Government which wound its way to a final conclusion." Defendants' Mem. at 3. "Judicial" proceedings can include quasi-judicial proceedings, such as arbitration proceedings, *Sturdivant, supra*, 459 A.2d at 459, or a hearing before the Hacker's License Appeal Board, *Mazanderan v. McGranery*, 490 A.2d 180 (D.C.App.1984).

But, even if the bid protest could be considered part of a quasi-judicial proceeding, the communication now at issue is the

affidavit prepared by Elliott. The bid protest itself was filed by defendant National Capitol Systems. The jury exonerated this defendant, possibly by application of the Court's caveat, during reinstruction on the meaning of malice, that the jury should remember that the communications at issue were made as part of a bid protest which an interested party has a right to file. Tr. (Oct. 10, 1985). Elliott, as opposed to defendant National Capitol Systems, had no right to initiate a bid protest. And although the absolute privilege may apply to testimony by affidavit, *see* Prosser and Keeton on Torts, *supra*, at 817 & n. 16, defendant Elliott's "testimony", if it can be called that, was not delivered before any type of tribunal assembled to hear and evaluate evidence. Free flow of information in a hearing before a judicial or quasi-judicial tribunal is the basis of the absolute privilege. *See id.* at 818–19.

■ Even if the affidavit were viewed as a part of a complaint in a quasi-judicial proceeding, it is the law in the District of Columbia that:

the absolute privilege attaches to statements in affidavits filed in judicial proceedings only if it appears that the affiant had probable cause to make the affidavit.... The question of whether undisputed facts constitute probable cause is one of law to be decided by the court.

*King v. Hildebrandt*, 331 F.2d 476 (2d Cir. 1964); *Slater v. Taylor*, 31 App.D.C. 100, 104–05 (1908). Although this rule was applied in the context of an affidavit preliminary to a lunacy proceeding, it could by analogy apply as well in the civil context. Here, it cannot be said that undisputed facts establish probable cause since no facts other than defendant Elliott's testimony confirm the alleged conversation or its content. For these reasons, the affidavit at issue should not entitle defendant Elliott to an absolute privilege for his statement. Defendant Elliott's only legitimate interest in making the affidavit at issue was to bring to the government's attention, although indirectly through a third party's bid protest, potentially unethical conduct of a government employee. As such, the affidavit is properly characterized as a petition to the government for redress of a grievance rather than a filing in a quasi-judicial proceeding.

In the recent Supreme Court case of *McDonald v. Smith*, —— U.S. ——, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985), an individual wrote to the President as well as other United States government officials questioning the character of an applicant for the position of United States Attorney. The Supreme Court held that when an individual is exercising this right under the Petition Clause of the First Amendment, only a qualified privilege attaches. The Court stated the strong policy reasons behind its holding:

an individual, who *maliciously, wantonly,* and *without probable cause,* asperses the character of a public officer in a written or printed paper, delivered to those who are invested with the power of removing him from office, is responsible to the party injured in damages, although such paper is masked under the specious cover of investigating the conduct of such officer for the general good. Public policy demands no such sacrifice of the rights of persons in an official capacity, nor will the law endure such a mockery of its justice.

105 S.Ct. at 2790 (emphasis in original) (quoting *Gray v. Pentland*, 2 Serg. & R. 23 (1815)).

In *Bradley v. Computer Sciences Corp.*, 643 F.2d 1029 (4th Cir.), *cert. denied*, 454 U.S. 940, 102 S.Ct. 476, 70 L.Ed.2d 248 (1981), plaintiff was an electronic engineer in the federal Defense Communications Agency. Defendant corporation was a government contractor. The individual defendants were employees of that corporation. Defendant corporation wrote a letter to plaintiff's supervisors complaining about improper conduct on the part of plaintiff. The letter served as the basis for an official reprimand received by plaintiff. In plaintiff's subsequent libel suit against defendant corporation and its employees, the court characterized the right exercised by

defendants as the "right to petition for redress of grievances," and held defendants' conduct to be protected by a qualified privilege. To recover damages, defendants would have had to have shown that the qualified privilege "was ... abused." *Id.* at 1033.

The court in *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329 (7th Cir.), *cert. denied*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977) dealt with a complaint by a corporation and some of its officers concerning an internal revenue agent's performance of his duties in an audit. According to the court:

> [T]he presentation of complaints about an auditing IRS agent's professional conduct to his superiors is a classic example of the right to petition.

*Id.* at 1343 (footnote omitted).

■ Finally, our Court of Appeals has cautioned that under the "well-settled common law principle", grants of absolute immunity "ought to be interpreted narrowly to serve only the purposes justifying the immunity." *Webster v. Sun Co., Inc.*, 731 F.2d 1, 4 (D.C.Cir.1984). Here, defendant Elliott and his company and co-defendant, Rehab, were not eligible to bid on the contract at issue and thus were not privileged to file the bid protest. The crux of Elliott's affidavit, and in fact of the bid protest itself, was an attack on the ethics of a government employee. As such, it is properly viewed as a petition to the government. It is in fact generous to view it as such, since Elliott did not deliver his grievance directly to the proper government authority to hear his grievance, but instead went through a private corporation and its bid protest. The fact that he took this less direct and more questionable route should not work in his favor by affording him a potentially absolute privilege from suit as a part of a bid protest. *Cf. Joftes v. Kaufman*, 324 F.Supp. 660, 664 (D.D.C.1971). He did, however, anticipate that his affidavit would support a grievance directed to the government. Under the reasoning of the Petition Clause cases, *supra*, a qualified privilege was properly held to apply to

defendants' conduct. Supplemental Pretrial Order at 2 (filed Oct. 2, 1985). Consequently, neither a new trial nor a judgment notwithstanding the verdict is justified on this ground.

### C.

■ Defendants further argue that plaintiff was a public official, thus it was his burden under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974) to prove "actual malice" by "clear and convincing evidence." Defendants' Mem. at 3–4. Under the actual malice standard, a plaintiff must prove that a defendant acted "with knowledge that [a defamatory statement] was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). The actual malice standard preempts state tort law not only as to the standard of proof, but also as to the burden of proof. Thus, a plaintiff must prove actual malice by clear and convincing evidence.

■ In this case, the Court gave instructions on common law malice, not actual malice. Common law malice is "frequently expressed in terms of either personal ill will toward the plaintiff or reckless or wanton disregard of the plaintiff's rights." *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 252, 95 S.Ct. 465, 470, 42 L.Ed.2d 419 (1974). Malice need only be proved by a preponderance of the evidence. D.C. Jury Instruction 17–13.

The Court applied the common law malice and preponderance of the evidence standards because of a concern that, in the special circumstances presented here, a plaintiff in Lewis' position would be helpless to defend himself from the type of libel alleged in this case. First, plaintiff is a relatively low level government employee. He worked himself up through the ranks over 19 years to a GS–14 position. He had responsibility for overseeing the operations of certain government contractors, but it is unclear that he is one "among the heirarchy of government employees

who have, or appear to the public to have, substantial responsibility for or control over the conduct of government affairs" or that his position was one "which would invite public scrutiny of the person holding it." *Rosenblatt v. Baer,* 383 U.S. 75, 86–87 & n. 13, 86 S.Ct. 669, 676–77 & n. 13, 15 L.Ed.2d 597 (1966). Moreover, as another judge on this court counseled many years ago:

> It should be emphasized that this ruling [as to government officials] is limited to high-ranking Government officials. It does not comprehend the entire Government personnel. The host of Federal, State, municipal and local government administrators, scientists, lawyers, physicians, secretaries, clerks, inspectors of various kinds, policemen, firemen, letter carriers, mechanics, laborers, and others, are not affected and are not deprived of their rights under the law of libel. By entering Government employment, a person does not lose any of his civil rights. The exception is limited to high-ranking Government officers in order to secure the constitutional freedom for every citizen to discuss and criticize his Government.

*Clark v. Pearson,* 248 F.Supp. 188, 193–94 (D.D.C.1965). Plaintiff here does not appear to hold the type of government position set out by the *Clark* court as appropriate for application of the actual malice standard. Second, the particular allegation was that plaintiff had *told* defendant certain incriminating facts. Defendant claims there were no witnesses to the conversation, and if, as plaintiff alleges, it never occurred, of course there would be none. Because he was forced to prove a negative, it would have been extraordinarily difficult for plaintiff to prove by clear and convincing evidence that the conversation recounted by defendant Elliott with "a straight face" did *not, in fact,* occur.* Another factor of concern in this case was that defendant Elliott did not go to the govern-

ment with his allegations, but instead went to a private company, thereby jeopardizing his claim to a qualified privilege for his conduct. *See Bradley, supra,* 643 F.2d at 1033 (qualified privilege applies when information communicated to "proper authorities").

Finally, in selecting the preponderance of the evidence instruction in this case, the Court was also sensitive to Justice White's concerns and suggestion in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* — U.S. ——, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Justice White recognized that "[c]riticism and assessment of the performance of public officials and of government in general are not subject to penalties imposed by law." 105 S.Ct. at 2950 (White, J., concurring). He continued, however, to observe:

> But these First Amendment values are not at all served by circulating false statements of fact about public officials. On the contrary, erroneous information frustrates these values.... Yet in *New York Times* cases, the public official's complaint will be dismissed unless he alleges and makes out a jury case of a knowing or reckless falsehood.
>
> . . . .
>
> If the plaintiff succeeds in proving a jury case of malice, it may be that the jury will be asked to bring in separate verdicts on falsity and malice. In that event, there could be a verdict in favor of the plaintiff on falsity, but against him on malice. There would be no judgment in his favor, but the verdict on falsity would be a public one and would tend to set the record right and clear the plaintiff's name.

*Id.* at 2950 & n. 2. Here, plaintiff has received his verdict on falsity. The jury was given a bifurcated verdict form. The first question asked was:

> Has plaintiff proved by a preponderance of the evidence that any statement

---

* Even had the Court instructed as to actual malice, there is corroborating evidence which could allow a jury to find the burden met, e.g., a representative of Capital Systems testified that Lewis had never been offered a job there and the jury received documents testifying to Lewis' character. Plaintiff's Exhibit U

made about Lewis by one or more defendants in paragraphs 4, 5, 6, 7 and 8 of the Elliott Affidavit and/or any statement in the bid protest letters of December 14 and 29, 1983, was, viewed in context, false, that is, not substantially true?

Verdict Form (filed Oct. 10, 1985). The jury answered "Yes." It must be noted that whatever the result of subsequent proceedings in this case, plaintiff has vindicated his name and thus has received the primary component of the relief he sought.

Despite all these concerns, a close review of the case law, not endeavored by either of the parties to this action, reveals that the court arguably instructed the jury as to the incorrect standard and burden of proof. As discussed *supra*, defendants' privilege is properly determined under the Petition Clause of the First Amendment. The recent Supreme Court case of *McDonald*, *supra*, held that the right to petition is protected by a qualified privilege, and that damages could be recovered upon a showing that the defendant acted with "malice." 105 S.Ct. at 2791. But, "malice" under North Carolina law, the law at issue in *McDonald*, is defined in terms consistent with the "actual malice" standard of *New York Times*. Moreover, the Court's *sua sponte* review of the district court opinion in that case reveals that the burden of proof to defeat the qualified privilege to petition was to have been clear and convincing evidence. *Smith v. McDonald*, 562 F.Supp. 829, 843 (M.D.N.C.1983), *affd.*, 737 F.2d 427 (4th Cir.1984), *affd.*, —— U.S. ——, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). Thus, although *McDonald* provides precedent for applying a qualified, rather than an absolute, privilege to defendants' conduct in this case, it does not literally justify deviating from the actual malice standard and burden of proof of *Gertz* and *New York Times*. Even though the *McDonald* decision does not literally justify deviating from the clear and convincing evidence burden of proof, a plausible reading of the decision directs courts to apply their own state law, qualified privilege and malice being common law concepts. In the District of Columbia, a qualified privilege can be overcome by a showing of malice by a preponderance of the evidence. D.C. Jury Instruction 17–13. Accordingly, the Court so instructed the jury.

If the *McDonald* decision is read to require application of the actual malice standard and the clear and convincing burden of proof, it could also be argued that because the Supreme Court has applied the same standard of protection under the Speech Clause and the Petition Clause of the First Amendment, the same limitations on that protection should also apply. That is, perhaps the plaintiff must be either a public official or a public figure in order to be required to meet the actual malice mandates of the Petition Clause, as well as the Speech Clause. The Supreme Court has, however, recently placed renewed emphasis on the character of the *speech* at issue in a defamation case, as opposed to the status of the victim or the speaker, in determining when the actual malice standard should apply. According to the Court in *Dun & Bradstreet, supra*, 105 S.Ct. at 2941: "The question presented in this case is whether this rule of *Gertz* applies when the false and defamatory statements do not involve matters of public concern." The Court reiterated that: "[i]t is speech on ' "matters of public concern" ' that is 'at the heart of the First Amendment's protection.' " *Id.* at 2943–44 (quoting *First National Bank of Boston v. Belotti*, 435 U.S. 765, 776, 98 S.Ct. 1407, 1415–16, 55 L.Ed.2d 707 (1978) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 101, 60 S.Ct. 736, 744, 84 L.Ed.2d 1093 (1940))). The right to petition the government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of America, District 12 v. Illinois State Bar Association*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967). Moreover, "the right to petition is logically implicit in and fundamental to the very idea of a republican form of governance." *Stern, supra*, 547 F.2d at 1342 (citing *United States v. Cruikshank*, 2 Otto 542, 552, 92 U.S. 542, 552, 23 L.Ed.

588 (1875)). Thus, the First Amendment concern in this case is very strong. Furthermore, the Court in *Gertz, supra,* recognized the high price demanded under the actual malice standard:

> Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test. Despite this substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehoods concerning public officials and public figures.

418 U.S. at 342–43, 94 S.Ct. at 3008–09. Under the above articulated theories, it might not be unjust for plaintiff in this case to be required to prove by clear and convincing evidence that defendants acted with actual malice. Here, the subject of the speech was the ethics of a government employee and thus his fitness for office. This subject matter is quintessentially one of public concern. Consequently, a balance between the First Amendment concern and the state interest in damage recovery by the particular plaintiff may require application of the actual malice standard.

Even under an analysis which looks to the status of the plaintiff, this Court may have been bound to find the plaintiff here to be a public official. Cases from other federal and state jurisdictions interpreting the meaning of the term "public official," even as against non-media defendants, give the term a broad interpretation. The court in *Rusack v. Harsha,* 470 F.Supp. 285 (M.D.Pa.1978) found that a supervisory contract negotiator at the United States Navy Ships Parts Control Center was a public official for purposes of a suit against a private individual who wrote an allegedly defamatory letter to the Secretary of Defense. Relevant to the court was that plaintiff:

> [was] involved in solicitations for contracts, requests for proposals, formal advertising, negotiating, and ha[d] buying and contract officer authority . . .

*Id.* at 298. The court in *Karr v. Townsend,* 606 F.Supp. 1121 (W.D.Ark.1985) found a deputy sheriff to be a public official in a suit against the acting sheriff who terminated him and allegedly libeled him. Federal drug enforcement agents were held public officials for purposes of a counterclaim against an arrestee for defamation. *Meiners v. Moriarity,* 563 F.2d 343 (7th Cir.1977). Parents of high school students presented a list of grievances to the school board concerning a teacher's conduct; the teacher was held to be a public official. *Sewell v. Brookbank,* 119 Ariz. 422, 581 P.2d 267, 270 (1978). Finally, in a defamation action against neighbors who mailed a letter to a detective's supervisor alleging that he threatened children and kicked pets, the detective was deemed a public official. *Roche v. Egan,* 433 A.2d 757, 763 (Me.1981).

Here, plaintiff had, or was perceived to have, power over the awarding of government contracts. *Rosenblatt, supra; Rusack, supra.* The bid protest and affidavit related to the conduct of his official duties and referred to a specific federal statute which circumscribed his conduct. Accordingly, plaintiff may well be a public official for purposes of this defamation action, in which case he should have been required to prove actual malice by clear and convincing evidence. Because of the considerable doubt on the subject of the standard and burden of proof, neither a directed verdict for defendants nor a new trial is justified on this issue. However, if there is to be a new trial, it would be necessary to revisit, hopefully with guidance from the Court of Appeals, the burden and standard of proof required.

### D.

Defendants claim that the court should grant a new trial for another reason: the excessive size of the verdict. Here, the rule is:

> [T]he Court may not substitute its own judgment as to the amount of damages for the judgment of the jury. The ques-

tion is not whether the Court would have awarded a smaller sum than was awarded by the jury. The question is not whether the size of the verdict was merely too great. It is whether the verdict was brought about by passion and prejudice; whether it is so exorbitant as to shock the conscience of the Court; and even whether it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate. *Graling v. Reilly,* 214 F.Supp. 234, 235 (D.D.C.1963); *R.A. Weaver and Assoc., Inc. v. Haas and Haynie Corp.,* 663 F.2d 168, 174 (D.C.Cir.1980); *Williams v. Steuart Motor Co.,* 494 F.2d 1074, 1085 (D.C. Cir.1974). The proof of damages offered at trial were as follows:

Plaintiff testified that he calculated that he had lost a total of $352,000 because of taking the early retirement option from DHHS, a decision he claimed was precipitated by defendants' publications and their aftermath. Transcript of Proceedings (Tr.) (Oct. 7, 1985); Defendants' Mem. at 9.

Dr. Aaron Stills testified that plaintiff had been attending psychological sessions once a week since June, 1985, at a rate of $60 a session. Stills further testified that treatment would continue for at least one year. Tr. (Oct. 9, 1985);

Dr. Applewaite testified that he treated plaintiff's physical conditions at Group Health Association, Tr. (Oct. 9, 1985), and plaintiff's medical records were submitted into evidence. Plaintiff's Exhibit R. These records contained no evidence as to the cost of the medical services provided.

 After *Gertz, supra,* a plaintiff cannot recover future damages absent proof that they will actually be sustained. 418 U.S. at 349–50, 94 S.Ct. at 3011–12; D.C. Jury Instruction 17–16 & comment. Plaintiff offered the figure of $352,000 as his future lost earnings, but offered no proof that he would actually sustain damages in that amount. His current salary at a consulting firm is $15,000, but there is no reason to believe that it could not increase or plaintiff will not change to a higher paying job. The figure offered by plaintiff must therefore be deemed insufficient as to future damages. Plaintiff testified that the figure was to compensate him for damages suffered from his retirement to the age of 74. He retired two years ago, and he is now 49. He thus calculated his damages for a 25–year period. The jury could reasonably award him only $2/25 \times \$352,000 = \$28,160$. But there is no indication that the $15,000 per year received by plaintiff from his other job was factored into the $352,000 figure announced by plaintiff as his calculated lost earnings. For the jury to assume that it was included in plaintiff's calculation, without testimony to that effect, would be for it to engage in impermissible speculation. The approximate figure of $15,000 multiplied by the same two-year period since retirement equals $30,000—approximately the amount the jury could have reasonably awarded for earnings actually lost as a result of the defamation at issue. The two amounts cancel each other out, thus the jury could not reasonably award plaintiff any amount for earnings actually lost.

Defendants questioned at trial, and question again in these motions, the qualifications of Dr. Aaron Stills, offered by plaintiff as an expert witness to testify on plaintiff's mental health. Dr. Stills testified that he was educated at Howard University, that he received a B.A., M.A., and Ph.D., and that he received his M.D. from Columbia. He further testified that he has been in private practice since 1977 and holds a certificate from the National Academy of Certified Mental Health Counselors. He indicated that he chose certification as a mental health counselor as an alternative to certification as a psychologist because the former emphasizes a preventative approach. He testified that he sees patients on a regular basis, approximately ten per week, and that physicians regularly refer patients to him.

 The test for determining the admissibility of expert evidence is whether

the opinion offered will be likely to aid the trier of fact in its search for truth. *Jenkins v. United States*, 307 F.2d 637, 643 (D.C.Cir.1962) (en banc). According to the *Jenkins* court:

> The kinds of witnesses whose opinions courts have received, *even though they lacked medical training and would not be permitted by law to treat the conditions they described*, are legion. The principle to be distilled from the cases is plain: if experience or training enables a proffered expert witness to form an opinion which would aid the jury, in the absence of some countervailing consideration, his testimony will be received.

*Id.* at 644 (emphasis in original). Moreover, it is the general rule that the "training and specialization of the witness goes to the weight rather than the admissibility of evidence." *Baerman v. Reisinger, M.D.*, 363 F.2d 309, 310 (D.C.Cir.1966).

■ Here, Dr. Stills testified extensively as to his training and qualifications. He went to an accredited school, obtained three advanced degrees, and sees patients on a regular basis. Plaintiff's examination and defendants' cross examination of the witness all occurred within the jury's presence, thus allowing it to assess the weight to be given the opinions advanced. The qualification of Dr. Stills as an expert witness was not in error.

■ Dr. Stills testified that plaintiff would require treatment for at least another year, and that he had been receiving treatment since June, 1985. The maximum amount the jury could award for the cost of psychological treatment was thus [14 (weeks from June until October 7 trial) × $60 = $840 (costs already incurred)] plus [$60 × 52 (weeks in a year) = $3120] = $3960.

Dr. Applewaite testified that he treated plaintiff for physical symptoms which could be caused by anxiety, and the jury received plaintiff's medical records as an exhibit. But even if the jury could have found a proper causal connection between the symptoms and the libel, there was no evidence as to the cost of any of the plaintiff's treatments. To allow the jury to award any amount would be to allow it to engage in impermissible speculation. Consequently, any award for medical expenses would be unreasonable. The maximum amount of damages due to expenses incurred that a jury could reasonably award was thus $3960.

■ The jury could also award damages to compensate plaintiff for the detraction from his reputation and for mental anguish. As to damages to reputation, recovery of general intangible damages is permissible without proof of actual loss, *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 659–60 (D.C.Cir.1966), but they are extremely difficult to quantify. *Airlie Foundation, Inc. v. Evening Star Newspaper Co.*, 337 F.Supp. 421, 431 (D.D. C.1972). It must be remembered that the award is intended to compensate plaintiff, not punish defendants, recovery of punitive damages having been explicitly denied. Thus a nominal recovery may be sufficient to vindicate the injury to reputation. *Id.* (noting that $1 may be enough). As the court in *Afro-American Publishing Co., supra*, observed:

> The allowance of nominal damages performs a vindicatory function by enabling the plaintiff to brand the defamation publicly as false.

366 F.2d at 660; *see also Dun & Bradstreet, supra*, 105 S.Ct. at 2948–54 (White, J., concurring) (quoted at Part II, C, *supra*). Such nominal recovery is especially appropriate where events subsequent to the publication at issue substantially cleared plaintiff's name. *Id.* Here, an investigation occurred pursuant to defendant's publication after which plaintiff was cleared of wrong-doing and the bid protest, denied. Thus any injury to plaintiff's reputation in the eyes of others could only be nominal. This fact is confirmed by the lack of testimony at trial as to plaintiff's diminished reputation among his co-workers at DHHS or within the community at large. Most important, the jury's special verdict has vindicated plaintiff by its determination that Elliott's statement was false. The

maximum reasonable amount the jury could have awarded for damage to plaintiff's reputation is thus $100.

■ The jury could also award plaintiff damages for mental anguish and physical pain actually suffered. Plaintiff testified as to his sufferings, Dr. Stills confirmed that the incident caused plaintiff anguish, and here plaintiff's medical records may be relevant as an indication of his ailments, although not the cost of treatment. The evidence of mental and physical suffering was not, however, sufficient to permit the jury to award $470,940 ($475,000 – $4060 ($3960 + $100)). An amount of $50,000 defines the reasonable maximum.

The Court concludes that the jury's damage award exceeded the maximum limit of the reasonable range within which the jury could reasonably operate. The maximum reasonable amount of total damages that the jury could have awarded plaintiff was thus $54,060 ($50,000 + $4060). Accordingly, a remittitur is appropriate, and if not consented to by plaintiff, there will be a new trial.

### III.

■ As the above discussion indicates, there is substantial doubt as to the standard and burden of proof to apply to this case. Under any standard and burden of proof the damages awarded in this trial were unreasonable. Thus at the very least, an offer of remittitur to the plaintiff is appropriate. If plaintiff refuses to consent to a remittitur, however, a new trial will be required. But it would be duplicative and wasteful for the Court and the parties to undergo a second trial without having the fundamental question of the standard and burden of proof resolved. Unlike the usual situation where after a retrial the result of either the first or the second trial will be dispositive after appeal, here the Court is faced with a greater-than-three-fold dilemma. The dilemma here is three-fold, because there are three different standards and burdens of proof which could plausibly apply: absolute privilege (obviating trial completely); constitutional qualified privi-

lege (instructions as to actual malice to be found by clear and convincing evidence); and common law qualified privilege (instructions as to malice to be found by a preponderance of the evidence). Moreover, there are greater than three potential permutations of trial, since the damages awarded in the trial at issue were unreasonable thus necessitating a retrial on damages even under the instructions as already given. But if the Court orders a new trial as to damages alone, the result of both trials could become moot should it be found on appeal that the Court should have applied the actual malice or absolute privilege standard. The same is true if the Court orders a new trial with instructions on actual malice; should the absolute privilege standard be found appropriate both trials would be moot, and should the common law malice standard be found to apply yet a third trial to reduce the excessive damages found by the first trial would become necessary.

■ Because of the dilemma posed by this special case, the Court will structure the accompanying Order in a special way. The accompanying Order will deny defendants' motion for a new trial conditioned upon the consent to a remittitur by plaintiff to all damages in excess of $54,060. If plaintiff consents to the remittitur, defendants can, if they are willing to take the risk, go immediately to the Court of Appeals where the issue of the standard and burden of proof will surely be raised. If plaintiff does not consent to the remittitur, a new trial will be required. If a new trial is required, the Court may well limit the jury's deliberations to damages, thereby not revisiting the first jury's finding of liability by a preponderance of the evidence. But before putting the Court and the parties through the burden and expense of two trials, neither of which may be dispositive, the Court will allow the parties to seek definitive guidance from the Court of Appeals. An order granting a new trial is not final and thus ordinarily not appealable. *Delano v. Kitch*, 663 F.2d 990 (10th Cir.1981), *cert. denied*, 456 U.S.

946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). However, orders not ordinarily appealable may be subject to appeal if certified by the district court pursuant to 28 U.S.C. § 1292(b).**

Here, the Court of Appeals has a full record on which to make a definitive decision on two critical legal issues. The questions of whether an absolute privilege or a qualified privilege applies, and whether if a qualified privilege applies the actual malice standard and burden of proof should apply, are controlling questions of law as to which there is substantial ground for difference of opinion and an immediate appeal from this order may materially advance the ultimate termination of this litigation. Accordingly, the accompanying Order will certify this question to the Court of Appeals pursuant to 28 U.S.C. § 1292(b).

---

** Most analogous to an order granting a new trial is an order remanding proceedings to a state court, *Poirrier v. Nicklos Drilling Co.,* 648 F.2d 1063, 1065 (5th Cir.1981) or to the Army Board for Correction of Military Records, *Silver v. Secretary of the Army,* 554 F.2d 664, 665 (5th Cir.1977).