**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

REX BAUMBACK,
Plaintiff-Appellant,

v.

AMERICAN BROADCASTING COMPANIES,
INCORPORATED,
Defendant-Appellee.

No. 97-2316

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-97-199-A)

Argued: May 7, 1998

Decided: August 13, 1998

Before MICHAEL and MOTZ, Circuit Judges, and
TRAXLER, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Thomas Patrick Dugan, SUROVELL, JACKSON,
COLTEN & DUGAN, Fairfax, Virginia, for Appellant. Kevin Taylor
Baine, WILLIAMS & CONNOLLY, Washington, D.C., for Appellee.
**ON BRIEF:** R. Hackney Wiegmann, Robert A. Van Kirk,
WILLIAMS & CONNOLLY, Washington, D.C.; Stephanie S.
Abrutyn, ABC, INC., New York, New York, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Rex Baumback ("Baumback") appeals the district court's grant of summary judgment to ABC News ("ABC") in his suit against ABC for libel. Having determined that Baumback was both a "public official" and a "public figure," the district court granted summary judgment on the ground that Baumback failed to offer any evidence that ABC acted with "actual malice." We affirm.

I.

Baumback's suit against ABC was occasioned by a reference made to Baumback in the "It's Your Money" report (the "Report"), a part of ABC's television news program "World News Tonight with Peter Jennings" on September 2, 1996. The subject of the Report for that evening was the alleged mishandling of certain timber contracts by officials of the United States Forest Service ("Forest Service") in charge of California's Eldorado National Forest ("Eldorado" or the "Forest"). At the time of these contracts, Baumback was the Timber Management Officer and Contracting Officer for timber sales in Eldorado. At the time of the broadcast, however, he had become a Timber Sale Contract and Appraisal Specialist in the Forest Service's headquarters in Washington, D.C. The timber contracts that were the subject of the Report were noteworthy because the Forest Service later cancelled them, creating a tremendous amount of legal exposure for the United States.

The Forest Service first approved the sale of certain tracts of Eldorado timber beginning in the early 1980s. At that time the necessary environmental assessment, a prerequisite for the sale of any federally-owned timber, was performed for these tracts, but the Forest Service decided later that the approved sales should be "shelved." When the tracts were finally put on the market in 1992, the decision

2

to sell them was not reevaluated under more current environmental standards. The Forest Service nevertheless entered into some sixteen contracts to sell the Eldorado timber.

The failure of the Forest Service to reevaluate the sales drew fire from environmental groups, who argued that these sales were illegal under newer environmental standards. Unconvinced, the Forest Service officials in charge of Eldorado determined that reapproval was not required, and they contracted to sell the tracts anyway. As Timber Management Officer and Contracting Officer for Eldorado, Baumback was intimately involved in this decision-making process and soon found himself at the center of the controversy surrounding the timber contracts.

As a result of this controversy, Forest Service officials agreed in December 1992 to reconsider the sales. In the spring of 1993, a total of twenty-four contracts for the sale of Eldorado timber, including the sixteen entered into in 1992, were cancelled. Because of these cancellations, various timber companies brought breach of contract and related claims against the United States. Those claims, potentially totaling $24 million, remain unresolved.

After the cancellation of the Eldorado contracts, media attention focused on Baumback as one of the Forest Service officials responsible for the aborted sales. On January 30, 1994, The Fresno Bee identified Baumback as "the agency official responsible for preparing the disputed sales," and reported Baumback's statement that new environmental evaluations of the disputed tracts were not performed "because he [Baumback] and his colleagues . . . had misinterpreted the requirements." J.A. 312. Further, an April 1994 article in Sacramento's The Business Journal profiled Baumback as the "Tree Rex" of Eldorado, quoting Baumback's statement that his main responsibilities at Eldorado were "to prepare timber sales ... [and] administer timber sale contracts." J.A. 312.

According to the Forest Service's official description of Baumback's position as Timber Management Officer for Eldorado, Baumback was "responsible for providing the leadership, coordination and direction for the overall timber management program." J.A. 238. In Baumback's curriculum vitae, he stated that, as Contracting Officer

3

for Eldorado, he was responsible for "all contract actions by the government." J.A. 233. And in his position at national headquarters as Timber Sale Contract and Appraisal Specialist for the Forest Service as a whole -- the position he held at the time of ABC's broadcast -- Baumback's duties included "developing national policy related to timber sale contracts and timber sale appraisals." J.A. 234. By his own admission, at least by the time of the broadcast, Baumback had become "the man" with regard to national policies governing timber sale contracts and appraisals.

Based on Baumback's prominent position in the controversy surrounding the cancelled Eldorado contracts and the significance of his subsequent position in Washington, D.C., ABC decided to feature Baumback in the Report. In preparing the Report, ABC made use of Baumback's job descriptions, news articles featuring Baumback as the primary source behind the decision not to reevaluate the disputed sales of Eldorado timber, and a "white paper" produced by the group Public Employees for Environmental Responsibility ("PEER") that harshly criticized Baumback's handling of the sales. In addition, the producers of "It's Your Money" interviewed or attempted to interview those involved in the dispute.

The result was a segment, approximately two and one-half minutes in length, that featured a reporter's explanation of the cancelled sales, as well as comments from two critics of the Forest Service's handling of these contracts. Baumback, who would not consent to an interview, was cited as "[t]he timber manager who pushed through the[ ] sales." J.A. 232.

The statement, however, that specifically gave rise to Baumback's defamation action was contained in ABC's "bumper" that preceded the Report. Immediately before a commercial break, Catherine Crier, the host of "World News Tonight with Peter Jennings" for that evening, stated:

> When we come back the $25 million mistake and the bureaucrat who got away with it. It's your money.

J.A. 231. Following the commercial break, the Report made clear that Baumback was the "bureaucrat" referred to in the bumper.

4

Baumback filed suit in Virginia state court, alleging the statement that he was the "bureaucrat who got away with it" was defamatory. ABC removed the suit to federal court and, after extensive discovery, moved for summary judgment. The district court granted ABC's motion, and this appeal followed.

II.

In New York Times Co. v. Sullivan, 376 U.S. 254 (1964), the Supreme Court established "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not," id. at 279-80. The district court found that Baumback was a "public official," and that he had offered no evidence of "actual malice" on the part of ABC. Our review of these determinations is de novo .

A.

Turning first to the district court's finding that Baumback was a "public official," we begin with the general rule that "the `public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." Rosenblatt v. Baer, 383 U.S. 75, 85 (1966) (emphasis added). Thus, our application of the "public official" designation turns on whether Baumback had substantial responsibility-- actual or apparent -- for the administration of governmental matters.

In determining if a defamation plaintiff actually had substantial responsibility for or control over the conduct of governmental affairs, courts examine whether the plaintiff "made [ ] recommendations, participated in [ ] policy determinations, and exercised [ ] discretion." Arctic Co. v. Loudoun Times Mirror, 624 F.2d 518, 521-22 (4th Cir. 1980). Even without a formal or apparent position as a "public official," a person "nevertheless may participate in some governmental enterprise to such an extent that the policies underlying [New York Times] would demand that he or she be classified a public official." Jenoff v. Hearst Corp., 644 F.2d 1004, 1006 (4th Cir. 1981).

5

It is equally clear, however, that a government employee may qualify as a "public official" if he merely <u>appears</u> to have substantial control:

> Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, ... the <u>New York Times</u> malice standards apply.

<u>Rosenblatt</u>, 383 U.S. at 85-86. "Public official" status can arise when a defendant "occup[ies] a position inviting scrutiny and discussion apart from that occasioned by the charges in controversy." <u>Jenoff</u>, 644 F.2d at 1006. As stated by the First Circuit:

> Policymakers, upper-level administrators, and supervisors are caught up in the public official net for [this] reason: <u>such plenipotentiaries occupy niches of apparent importance</u> sufficient to give the public an independent interest in the qualifications and performances of the person[s] who hold[ ] [them], beyond the general public interest in the qualifications and performance of all government employees.

<u>Kassel v. Gannett Co.</u>, 875 F.2d 935, 939 (1st Cir. 1989) (internal quotation marks omitted) (emphasis added).

In the instant case, the district court conferred"public official" status on Baumback because, as Timber Management Officer and Contracting Officer for Eldorado, Baumback was in a position of "`public trust' that involved administration of substantial public funds." J.A. 157. Although the district court did not expressly state that it found Baumback to be a "public official" as a result of his actual or apparent authority, or both, it determined that Baumback exercised discretion in deciding whether to award or modify contracts and exerted control over Eldorado's full timber management program. The district judge also found that Baumback's position as Contract Administration Specialist in Washington, D.C., involved substantial governmental responsibilities that rendered him a public official. Likewise, the court concluded that the public "had an `independent interest in the qualifi-

6

cations and performance of [Baumback]'" in his position as Eldorado's Timber Management Officer sufficient to make him a public official. J.A. 158.

We agree with the ultimate conclusion of the district court. Baumback was a public official by virtue of his actual and apparent authority. See Rosenblatt, 383 U.S. at 85. With regard to actual authority, in both his position at Eldorado and at the Forest Service headquarters in Washington, D.C., Baumback clearly had "substantial responsibility for or control over the conduct of governmental affairs."* To paraphrase Arctic, Baumback made recommendations (to the Forest Supervisor at Eldorado and the senior policymakers in Washington), he participated in policy determinations (for Eldorado as well as the Forest Service as a whole), and he exercised discretion (in awarding contracts to cut Eldorado timber). See Arctic , 624 F.2d at 522.

Indeed, in order to get an idea of the extent of Baumback's actual responsibility for and control over the administration of government affairs, one need only look at the government's official descriptions of his positions with the Forest Service. As Timber Management Officer for Eldorado, Baumback was charged with "providing the leadership, coordination and direction for the overall timber management program," and "[a]ct[ing] as the technical review authority for the full range of activities of the Forest timber management program." J.A. 238. In his capacity as Contracting Officer for Eldorado, Baumback had "full responsibility for entering into, modifying and administering [timber] contracts; and resolving appeals and participating in administrative reviews." J.A. 244. And in his subsequent position at the national headquarters, Baumback "provide[d] direction for national policies, standards, guidelines and procedures relating to log export

_____

*At oral argument, the parties disagreed as to when Baumback must be shown to have been a "public official." According to Baumback, ABC must show that he was a "public official" both at the time of the Eldorado sales and at the time of the broadcast. ABC argued that, although the proof showed Baumback was a public official on both occasions, only a showing of public official status at the time of the broadcast was necessary. In light of our holding that Baumback was a public figure both at the time of the events in question and at the time of the broadcast, we need not reach this question.

7

controls, the Operational phase of timber sales administration, and the sale and disposal of Forest Products." J.A. 246.

These same official job descriptions also created the appearance that Baumback's governmental responsibilities were significant. Notably, the official job descriptions were available to the public. Indeed, the government's descriptions of these duties were reprinted in its advertisements of the positions. In fact, ABC used these publicly available descriptions in preparing the Report. And, in his own curriculum vitae, Baumback maintained the appearance that he wielded substantial control. In it, Baumback asserted that he was responsible for Eldorado's entire timber program, as well as all sales contracts for Eldorado timber. His resume also indicated that in Washington, D.C., Baumback was "[r]esponsible[for] developing national policy related to timber sale contracts and timber sale appraisals." J.A. 234. In fact, he acknowledged in his deposition that he was "the man" with regard to the entire Forest Service's policies on timber appraisal and sale. In addition, Baumback's prominent role in controlling timber sales at Eldorado was frequently in the news, and there is no record that he objected to being featured as Eldorado's "Tree Rex" during the controversy surrounding the cancelled sales. We therefore find that Baumback had substantial responsibility, both actual and apparent, over the control of government affairs in his positions in Eldorado and in Washington, D.C.

Baumback, however, argues that our analysis of the "public official" question should not focus on his actual or apparent authority, but rather on his relative position to others within the administrative structure of the Forest Service. Baumback contends that he is not a public official for the purposes of this suit because he now works deep within the bureaucracy of the Department of Agriculture and because at Eldorado he was a relatively anonymous staff officer. We find such a "structural" argument unpersuasive.

Although we are aware of scattered opinions that base their conferral of "public official" status on a plaintiff's position within a governmental hierarchy, see, e.g., Lewis v. Elliott, 628 F. Supp. 512, 519 (D.D.C. 1986) (explaining that "public official" status should be "`limited to high-ranking Government officials'") (quoting Clark v. Pearson, 248 F. Supp. 188 (D.D.C. 1965)), we find that Baumback's

8

relative position is not dispositive. As long as either one of the grounds asserted in Rosenblatt -- actual or apparent substantial responsibility for or control over government affairs -- is present, a plaintiff qualifies as a "public official."

Baumback also contends that his responsibilities as Contracting Officer -- which Baumback contends was the basis for the district court's conclusion that he was a public official-- had nothing to do with the alleged $25 million mistake referenced in ABC's bumper. Rather, ABC's report indicated Baumback made the mistake in his capacity as Timber Management Officer, not Contracting Officer. Thus, Baumback contends that because ABC's statement implying that he was "the bureaucrat who got away with it" was unrelated to the source of his public official status, he was not a public official.

We conclude, however, that the distinction between Timber Management Officer and Contracting Officer is not a crucial one. Having determined that Baumback's actual and apparent authority with regard to Eldorado timber sales was comprehensive, our basis for conferring "public official" status on Baumback is broader than that of the district court. Moreover, we note that the position of Contracting Officer is included within the official government description of Timber Management Officer. Accordingly, we conclude that Baumback's "public official" status was indeed related to the "mistake" mentioned in the bumper.

Therefore, we agree with the district court's determination that Baumback was a "public official." Because we have determined that Baumback was a "public official," we need not address the district court's finding that he was also a "public figure."

B.

As a "public official," Baumback can defeat summary judgment only if he can demonstrate that ABC acted with "actual malice" in making the allegedly defamatory statement. "Actual malice" exists when a defamatory statement is made with the "knowledge that it was false or [made] with reckless disregard of whether it was false or not." New York Times, 376 U.S. at 280. A defamatory statement made with reckless disregard of the truth is one made with "a high degree of

9

awareness of ... probable falsity." Garrison v. Louisiana, 379 U.S. 64, 74 (1964). Thus, for liability to attach, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). In applying the New York Times malice standard, this circuit has consistently recognized the substantial burden that must be satisfied in order to establish actual malice. See, e.g., Church of Scientology Int'l v. Daniels, 992 F.2d 1329, 1334 (4th Cir. 1993) (explaining that "actual malice cannot be established merely by showing a departure from accepted journalistic or professional practices"); Ryan v. Brooks , 634 F.2d 726, 733 (4th Cir. 1980) (requiring "conduct ... so reckless ... that it approaches the level of publishing a knowing, calculated falsehood").

In the instant case, we agree with the district court's determination that Baumback failed to produce any evidence of actual malice. The record reveals that ABC made use of reliable information -- official job descriptions, government reports, and other media coverage containing information consistent with the official documentation -- in preparing the Report.

As official documents and media reports demonstrate, both Baumback and the Forest Service admitted that those in charge of timber sales at Eldorado erred in entering into the contracts in question. Baumback's official job description (which ABC used in preparing the Report) stated that, as Contracting Officer at Eldorado, he had plenary power over the awarding of timber sales contracts. Further, prior to ABC's broadcast, Baumback's prominent role in the approval of the sales had already been featured by the media, most notably in The Business Journal's "Tree Rex" profile. Thus, we can see nothing negligent, let alone reckless, in ABC's choice of Baumback to be the focus of its criticism.

Baumback, however, argues that he presented evidence that ABC knew that its singling-out of Baumback was wrong. According to Baumback, an outtake from the Report clearly indicates that ABC knew that its characterization of him as "the bureaucrat who got away with it" was inaccurate. The outtake ran as follows:

10

> John Martin [ABC correspondent, to Craig Thomas of Friends Aware of Wildlife Needs]: In your opinion, who was responsible for this?
>
> Thomas: Ah, there's, ah, the Forest Supervisor is the ultimate decision-making individual . . . but in that management team room, they make that decision as a group, they all listen to each other and hear each other's input. The District Rangers, the Forest Supervisor, the Planning Officer, and [in] particular the Timber Management Officer were all pushing, or turning a blind eye to the need to re-evaluate these sales.

J.A. 402. Baumback argues that, since he was mentioned as only one among many "pushing" the sales, this outtake demonstrates that ABC knew that he was not "the bureaucrat who got away with it."

However, we believe that the outtake does more harm than good to Baumback's argument in that it clearly singles out Baumback as the staff member who, "[in] particular," pushed for the sales to be made. When considered in conjunction with the other evidence ABC had in its possession -- official job descriptions, government reports, and other media coverage of the controversy consistent with official records -- this outtake appears to corroborate the fact that Baumback was indeed the Forest Service official most responsible for the timber sales going forward. Therefore, we find that the outtake does not constitute evidence that ABC acted with reckless disregard of the truth or falsity of the assertions made in the Report, and affirm the district court's conclusion that Baumback did not present sufficient evidence that ABC acted with actual malice.

III.

Because we agree with the district court's findings that Baumback is a "public official" who failed to demonstrate "actual malice" on the part of ABC, we conclude that summary judgment was warranted. Accordingly, we affirm the district court's order granting summary judgment.

AFFIRMED

11