Joyce WEBB, Plaintiff,

v.

Erias HYMAN, et al., Defendants.

Civ. A. No. 93–1822 (CRR).

United States District Court,
District of Columbia.

Aug. 18, 1994.

As Amended Nov. 5, 1994.

Anne Fraser, Washington, DC, for plaintiff.

John C. Cook, Asst. Corp. Counsel, and Jennifer Rie, Asst. Corp. Counsel, DC, Vanessa Ruiz, Acting Corp. Counsel, DC, Martin L. Grossman, Deputy Corp. Counsel, DC, and George C. Valentine, Chief, Gen. Litigation Section I, for Defendant District of Columbia.

Gary Howard Simpson, Bethesda, MD, for defendant Edward Paylor.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. INTRODUCTION

A four-day jury trial in this Court resulted in a jury verdict on March 21, 1994 in favor of Plaintiff Joyce Webb on her claims of (1) sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* as amended by the Civil Rights Act of 1991, and (2) the common-law tort of intentional infliction of emotional distress. Prior to trial and pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, the Plaintiff elected to proceed on these two claims, as she and her able counsel represented to the Court that they were her strongest claims upon which relief was sought. The Jury of ten returned a Verdict totalling $300,000.00 in favor of the Plaintiff, awarding $75,000.00 in damages against Defendant Edward Paylor and $225,000.00 against Defendant District of Columbia.

Before the Court are three sets of post-trial motions,[1] which include issues such as

---

1. More specifically, these pleadings before the Court include: (1) Defendant Edward Paylor's

whether the Comprehensive Merit Personnel Act or the Worker's Compensation Act preempt the Plaintiff's common law tort claim; whether there was sufficient evidence to support the Jury's Verdict; whether the Court made significant and unduly prejudicial errors in the admission of evidence and submission of a Verdict Form; and whether the Court should enter further judgment for the Plaintiff or award her injunctive relief or further damages. After careful consideration of the submissions of the parties, the trial materials, the testimony of the witnesses at trial, the arguments of counsel, the applicable law, and the entire record herein, the Court shall deny the Defendants' Motions, and shall grant the Plaintiff's Motion with respect to the major part of her request for injunctive relief, but shall deny the remainder of the Plaintiff's Motion.

## II. PROCEDURAL BACKGROUND

Ms. Joyce Webb, the Plaintiff in the above-captioned case, originally filed suit on August 30, 1993. As set forth in her First Amended Complaint, filed on September 13, 1993, she names as Defendants the District of Columbia and certain officials in the District of Columbia Department of Corrections in their official capacity (collectively "Defendant District of Columbia" or "the District"), as well as Mr. Edward Paylor, both individually and in his capacity as Chief of the Records Office of the District of Columbia Department of Corrections, Central Detention Facility. She brings this action on the allegation that as a Correctional Officer in the D.C. Department of Corrections, she was subjected to outrageous and illegal behavior by her supervisor and the District of Columbia. More specifically, Ms. Webb raises seven causes of action in her First Amended Complaint: (1) Deprivation of Equal Protection of the Law Based on Sex—*Quid Pro Quo* Sexual Demands As A Condition of Employment, pursuant to 42 U.S.C. § 1983; (2) Deprivation of Equal Protection of the Law Based on Sex—Mainte-

nance of a Hostile Working Environment, pursuant to 42 U.S.C. § 1983; (3) Deprivation of First Amendment Rights; (4) Gender Discrimination by Sexual Harassment, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* (5) Assault & Battery; (6) Intentional Infliction of Emotional Distress; and (7) Negligent Supervision and Selection of Officials.

At a status conference on December 10, 1993, held by the Court pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court instructed the Plaintiff to notify the Court of her two strongest claims. On January 11, 1994, in response to this Order, the Plaintiff filed a Notice designating her two strongest claims for damages which she believed should take priority for a jury trial. In the interests of justice, with the consent of all counsel, and pursuant to Fed.R.Civ.P. 42(b), on February 17, 1994, the Court ordered that this action would proceed to trial on these two claims, and separated out all other claims. Accordingly, the Court submitted to the Jury the following issue, with respect to each Defendant: (1) whether the Plaintiff has proved, by a preponderance of the evidence, each element of her claim of sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, on the basis of (a) *quid pro quo* sexual harassment; (b) creation of a hostile or abusive work environment; and (c) retaliation; (2) whether the Plaintiff has proved, by a preponderance of the evidence, each element of her claim for Intentional Infliction of Emotional Distress.

On March 21, 1994, the Jury returned a Verdict finding that the Plaintiff has proved, by a preponderance of the evidence, each element of Title VII sex discrimination on the basis of three theories: (1) *quid pro quo* sexual harassment, as to Defendant District of Columbia and Defendant Edward Paylor; (2) creation of a hostile or abusive work

Motion For Judgment Notwithstanding the Verdict, along with Defendant Edward Paylor's Motion For New Trial, the Plaintiff's (Consolidated) Opposition, and Defendant Paylor's Reply thereto; (2) Defendant District of Columbia's Motion for Judgment Notwithstanding the Verdict Or, in the Alternative, For a New Trial Or, in the Alter-

native, For a Remittitur, and Supplement/Amendment thereto, the Plaintiff's Opposition, and Defendant District of Columbia's Reply thereto; and (3) Plaintiff Joyce Webb's Motion For Entry of Judgment, to Amend Judgment and For Additional Relief, and the Defendants' Oppositions.

environment, as to Defendant District of Columbia and Defendant Edward Paylor; (3) retaliation, as to Defendant Edward Paylor. The Jury also unanimously found that the Plaintiff proved, by a preponderance of the evidence, each element of her claim for intentional infliction of emotional distress as to each Defendant. The Jury further found that she is entitled to recover compensatory damages against Defendant Edward Paylor in the amount of $75,000.00, and against Defendant District of Columbia in the amount of $225,000.00. On the same date, the Court entered a Judgment on the Verdict consonant with the Jury's findings.

On March 24, 1994, the Court vacated its Judgment on the Verdict against Edward Paylor, to the extent that the Judgment was based on the Jury's response to the Title VII claim against that Defendant individually. Because the parties' counsel had failed to bring to the Court's attention that the Plaintiff had no cognizable claim on Title VII against the individual Defendant Edward Paylor, the Court issued its Vacatur Order in light of the fact that Title VII only imposes liability upon "employers." 42 U.S.C. §§ 2000e–2, 2000e(b).

### III. BECAUSE THERE IS NO BAR TO THE PLAINTIFF'S TORT CLAIM, AND BECAUSE A REASONABLE PERSON, VIEWING THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFF, COULD REACH A VERDICT IN FAVOR OF THE PLAINTIFF, THE COURT MUST DENY THE DEFENDANTS' MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT.

■ Both Defendants move the Court to enter judgment as a matter of law pursuant to Fed.R.Civ.P. 50. Under this rule, where a party has been fully heard on a given issue and "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party...." Fed.R.Civ.P. 50(a)(1). The United States Court of Appeals for the District of Columbia Circuit has provided firm guidance in following this rule:

> An entry of judgment as a matter of law is warranted only if "the evidence, together with all inferences that can reasonably be drawn therefrom, is so one-sided that reasonable men [and women] could not disagree on the verdict." *Carter v. Duncan–Huggins, Ltd.*, 727 F.2d 1225, 1227 (D.C.Cir.1984). In making that determination, a court may not assess the credibility of witnesses or weigh the evidence.

*Hayman v. National Academy of Sciences*, 23 F.3d 535, 537 (D.C.Cir.1994) (citations omitted). Due to public policy concerns, entry of judgment as a matter of law is the exception, and not the rule. "Because a judgment as a matter of law intrudes upon the rightful province of the jury, it is highly disfavored." *Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C.Cir.1994); *see also Howard University v. Baten*, 632 A.2d 389 (D.C.1993) (stating that a judgment notwithstanding the verdict is not to be entered routinely, but "is proper only in 'extreme' cases, in which no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party") (citations omitted).

### A. NEITHER THE WORKERS' COMPENSATION ACT NOR THE COMPREHENSIVE MERIT PERSONNEL ACT BAR THE PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN THE DISTRICT OF COLUMBIA BECAUSE THAT TORT CLAIM IS INTERTWINED WITH THE PLAINTIFF'S TITLE VII CAUSE OF ACTION.

■ Both Defendants argue that the Comprehensive Merit Personnel Act ("CMPA") preempts the Plaintiff's claim for intentional infliction of emotional distress. According to the Defendants, the remedial scheme of the CMPA precludes the Plaintiff from bringing a civil action for the same claims, and therefore, this Court may not hear her tort claim. However, finding *King v. Kidd*, 640 A.2d 656 (D.C.1993) to be controlling, the Court must hold that the CMPA does not bar the Plaintiff from bringing her claim for intentional

infliction of emotional distress, because that claim is fundamentally related to her claims of sexual harassment and retaliation.

As the cornerstone of their argument, the Defendants rely on *District of Columbia v. Thompson*, 593 A.2d 621 (D.C.1991) (*Thompson II*), aff'g in part and vacating in part 570 A.2d 277 (D.C.1990) (*Thompson I*), cert. denied, —— U.S. ——, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991), for the proposition that Webb is barred by the CMPA's remedial scheme. *Thompson II* precluded a District employee from suing the District and her supervisor for certain torts. After reviewing the goals and language of the CMPA, the District of Columbia Court of Appeals in *Thompson II* stated that the Council of the District of Columbia intended that Act to "address ... virtually every conceivable personnel issue among the district, its employees, and their unions—with a reviewing role for the courts as a last resort, not a supplementary role for the courts as an alternative forum." *Id.* at 634.

The Court must reject the Defendants' arguments because the District of Columbia Court of Appeals' recent decision in *Kidd* limits *Thompson II*, and definitively states that the CMPA does not bar a claim for intentional infliction of emotional distress when that claim is fundamentally linked to charges of sexual harassment and retaliation. Like the case at hand, *Kidd* found that "Kidd's claim for intentional infliction of emotional distress was premised on, *and fundamentally related to*, her allegations (supported by evidence adduced at trial) of sexual harassment and retaliation," *Kidd*, 640 A.2d at 663 (emphasis added), and concluded that there was no CMPA preemption. That Court went on to state:

> After reviewing the purposes and text of the CMPA, ... we find no basis to conclude that CMPA's remedial system preempts Kidd's tort claim of intentional infliction of emotional distress based on acts of sexual harassment and subsequent retaliation.... Although the jurisdictional issue appellants raise concerns Kidd's common law claim and not her related Title VII sex discrimination claim, we think the exclusion of sexual harassment claims from

CMPA Subchapters 15 and 17 is persuasive evidence that appellee's tort claim—fundamentally linked to her sexual harassment claim—is not cognizable as a "personnel issue" under the Act's "performance ratings," "adverse actions," and employee "grievances" provisions.... Kidd's claim for intentional infliction of emotional distress had an inherent "nexus" to her sexual harassment claim, "a subject matter within the responsibility of a division of the Superior Court," and it was therefore proper for the court to "rely upon its general powers in accepting jurisdiction over the claim."

*Id.* at 664 (citations omitted). In light of the above approach by the highest appellate court in the District charged with responsibility for interpreting local law, this Court is not persuaded by the District's attempt to distinguish *Kidd*. Regardless of whom the Defendant may be, a tort claim *fundamentally linked* to a sexual harassment claim is more than a mere "personnel issue" under the CMPA, and therefore is not barred under that Act.

Not only is *Thompson II* outdated by *Kidd*, but *Thompson II* is also distinguishable for other reasons. For example, while *Thompson II* found that an employer's actions of refusing to consider an employee for promotion, or isolating her from other employees, were preempted by the CMPA, that Court ruled that Thompson's claims for assault and battery were not covered by the CMPA, and therefore not preempted. Moreover, *Thompson II* is also distinguishable because that case did not involve the intertwining of intentional infliction of emotional distress with Title VII sex discrimination.

■ Similarly, the Court is not persuaded by Paylor's argument that the Workers' Compensation Act ("WCA"), D.C.Code § 36–301 et seq., preempts Webb's claim. *Mason v. District of Columbia*, 395 A.2d 399, 403 (D.C.1978), held that common-law tort claims such as assault and battery are not barred by the Federal Employees Compensation Act ("FECA"), 5 U.S.C. § 8101, et seq. Extending this holding, *Coleman v. American Broadcasting Companies*, Civ. Action No. 84–1594, 1985 WL 365 (D.D.C. June 18, 1985)

(Parker, J.) rejected the defendants' contention that the WCA precludes common law tort recovery, and the late Judge Barrington D. Parker explained that *Mason*

> completely blunts and disposes of such argument. . . . Likewise, Ms. Coleman's allegations of assault, battery, defamation, and intentional infliction of emotional distress, all resulting from alleged sexual harassment, are not the sort of claims covered by the D.C. Workers' Compensation Act.
>
> *Since Ms. Coleman's common law tort claims are so inextricably linked to her sexual harassment claim, a cause of action not covered by the Act, plaintiff's right to recovery for such torts should not be confined exclusively to the Workers' Compensation Act.*

*Coleman* at *4 (citations omitted) (footnote omitted) (emphasis added). Thus, because *Coleman* is applicable to the facts at hand, there is no statutory bar to the Plaintiff bringing her tort claim before this Court.

### B. THE COURT SHALL NOT ENTER JUDGMENT AS A MATTER OF LAW, BECAUSE THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT.

██ In making their Motions, the Defendants list a series of arguments which they believe justify the entry of a judgment notwithstanding the verdict. However, because all the inferences from the evidence are not so one-sided that reasonable individuals could not arrive at the Verdict reached by the jurors in this case, the Court must affirm its entry of that Verdict.

### 1. THERE WAS SUFFICIENT EVIDENCE THAT DEFENDANT PAYLOR'S CONDUCT INTENTIONALLY INFLICTED EMOTIONAL DISTRESS.

██ To succeed on her tort claim, Webb had to show that the Defendants engaged in (1) "extreme and outrageous conduct" which (2) "intentionally or recklessly" (3) caused the Plaintiff "severe emotional distress." *Kidd,* 640 A.2d at 667–68 (citations omitted). Defendant Paylor argues that no reasonable

jury could conclude that he intentionally inflicted emotional distress on the Plaintiff, because there was no evidence of conduct rising to the level of being "outrageous," and even if there were, that conduct is too remote from any emotional trauma to establish any causation. However, the Court notes that the record contains testimony of conduct that reasonable individuals could find outrageous, as well as evidence that the Plaintiff's trauma arose as a consequence of this conduct.

Despite Paylor's attempt to downplay his behavior, there was sufficient testimony from witnesses describing his outrageous conduct. The District of Columbia Court of Appeals has provided considerable guidance for the review of this element of the common law tort claim:

> There are two primary components of "extreme and outrageous conduct" we must consider: (1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place . . .
>
> The court, in determining whether the conduct is outrageous, should first consider the nature of the activity. "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him [or her] actual or apparent authority over the other, or power to affect his [or her] interests." Restatement (Second) of Torts § 46 cmt. e.

*Id.* at 668. Ms. Webb's testimony on its own is sufficient to show this outrageousness, as she testified to repeated sexual assaults and retaliatory tactics by Paylor, her supervisor, which was known or should have been known by the Defendant District of Columbia. For example, she told the Jury that on June 20, 1992, Paylor locked her into a strip search room, forcibly kissing her and sticking his tongue in her mouth. In addition, she testified that Paylor fondled her, made a series of harassing phone calls, and, when she refused his advances, changed her work schedule and falsely accused her of stealing inmate property. In light of testimony from Ms. Webb, Ms. Teresa Washington, and others, as to Paylor's misuse of his supervisory powers, as to transgression of departmental rules on

leave, as to false accusations, and by virtue of other unacceptable behavior, there is no question that a jury of reasonable people could find Paylor's behavior outrageous.

The Court also rejects Paylor's assertion that his acts could not possibly have constituted outrageous conduct leading to severe emotional disturbance, on the theory that any threats occurred during 1992, and therefore did not cause the trauma which led her to leave work in May, 1993. First, Ms. Webb stated at trial that there was a course of harassing and discriminatory conduct from June, 1992 through May of 1993. Merely because the most offensive behavior subsided somewhat after. the latter portion of 1992 does not prevent a jury from finding a continuing course of conduct.

Second, even if Paylor had not mistreated Webb in 1993, there was sufficient opinion testimony to connect Paylor's outrageous behavior in 1992 with Webb's breakdown in 1993. In reference to sexual abuse by Ms. Webb's father, testimony from Dr. John Breeskin, Ms. Webb's psychologist, included the following:

> Once she had overcome her initial reluctance to bring up this painful aspect of her past, it became clear to me, and it is my opinion to a reasonable degree of psychological certainty, that her supervisor's sexually abusive conduct had tapped in to deeply repressed emotions about her childhood abuse. *Although Ms. Webb had previously confronted many significant stressors in her life successfully, it was the re-exposure to unwanted sexual demands by a person with authority over her that destroyed the coping mechanisms that she had constructed over the years, and caused her to react so severely to the harassment at this time.*

Direct Testimony of John Breeskin, Ph.D. at 4–5 (emphasis added). Dr. Breeskin went on to testify that he had diagnosed Ms. Webb as suffering from Post-traumatic stress disorder ("PTSD"), and that, while PTSD's are based on "traumatic events" which may be cumulative, Paylor's repeated sexual advances constituted a "traumatic event" in Dr. Breeskin's PTSD diagnosis. Dr. Breeskin's explanation that her PTSD culminated in a psychosomat-

ic rash and emotional trauma, therefore, adequately supports a claim for emotional distress.

A variety of other testimony further supports the Plaintiff's claim of trauma induced by Paylor which caused the Plaintiff to be emotionally distressed. Even one of the District's own witnesses, forensic psychiatrist Carol C. Kleinman, Ph.D., provided evidence of this causation. After interviewing the Plaintiff and reviewing a variety of medical and legal documents, Dr. Kleinman stated that Joyce Webb has been in a great deal of distress, and that Ms. Webb's perception of harassment caused that stress. More specifically, while the events causing distress were cumulative, according to Dr. Kleinman, they included sexual advances toward her by her supervisors; the fact that she was denied leave to which she felt entitled; and the fact that her supervisor had asked her to come to his house and talked to her about oral sex. In light of these statements, including Dr. Kleinman's acknowledgment that it is possible that Ms. Webb's perception of harassment is accurate, and all inferences that can reasonably be drawn therefrom, a jury determination that Paylor's behavior caused Webb's injury should not be cast aside.

Other lay testimony and evidence provide even more support for the Plaintiff's claim that she was traumatized by Paylor through various means of harassment. The Plaintiff submitted evidence indicating that Paylor insisted that Ms. Webb's record be marked as "AWOL," despite other officers' statements that she had leave available. In fact, there was evidence before the Jury that Paylor reversed authorization for leave which had originally been granted due to illness. Additionally, the Plaintiff's fiance testified that he perceived distress symptoms starting in the fall of 1992, which worsened through the spring of 1993. There was also sufficient evidence regarding her supervisor's efforts to silence her complaints and get back at her for refusing his solicitations. Reasonable individuals may well be offended by the retaliatory conduct in Paylor's own testimony, which revealed that he violated the legal mandate to process her compensation paperwork within five days by taking it home with

him, thus knowingly impairing an injured woman's rights for over two months.

## 2. THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE FINDING OF A REASONABLE JURY THAT THE DEFENDANTS' EXPLANATIONS OF DISCRIMINATION ARE PRETEXTUAL.

The District argues that it is entitled to judgment as a matter of law because there was insufficient evidence produced at trial to sustain the verdict of *quid pro quo* sexual harassment. In support of this argument, the District puts forth its version of legitimate, nondiscriminatory reasons for nine claims of *quid pro quo* harassment which, according to the District, constitutes the Plaintiff's case, and for which the Plaintiff has not submitted sufficient evidence to show that these reasons are pretextual. Because the District mischaracterizes the basis of the Plaintiff's case, and because the Plaintiff proffered sufficient evidence to convince a reasonable jury of pretext, the Court must reject the District's argument.

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court first established its system of applying this statute by allocating the order of presentation of proof and the burden of production in Title VII discrimination cases. This burden-shifting approach has been refined over the years, most notably in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and, more recently, in *St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

By a preponderance of the evidence, a plaintiff must first make out a *prima facie* case for relief by proving

(1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of [employer] liability.

*Highlander v. K.F.C. National Management Co.*, 805 F.2d 644, 648 (6th Cir.1986). Knowledge of employment decisions based on impermissible sexual factors is imputed to the employer, and the employer in a *quid pro quo* sexual harassment action is held strictly liable for the conduct of supervisory employees. *Id.* at 648–49. Upon the establishment of a *prima facie* case, the employer has the burden to "articulate some legitimate, nondiscriminatory reason" for the challenged action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

In *St. Mary's Honor Center v. Hicks*, Justice Scalia clarified the status of a discrimination action where a defendant has properly articulated a legitimate basis for an action in dispute:

If ... the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant.... The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture. The defendant's "production" (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven "that the defendant intentionally discriminated against [her]" because of [her gender].

*St. Mary's Honor Center v. Hicks*, —— U.S. at ——, 113 S.Ct. at 2749 (citations omitted). Significantly, the Supreme Court emphasized that "although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' "

*Id.* at ——, 113 S.Ct. at 2747 (citations omitted).

■ At trial, the Plaintiff presented a litany of adverse employment practices. According to the District, these actions all had legitimate, nondiscriminatory bases, and the Jury's finding of *quid pro quo* discrimination against the District was without sufficient support. However, this argument must fail, because a reasonable jury may find that these adverse employment actions resulted from her denial of Paylor's insistent and coercive requests for sexual favors.

In the case before the Court, sufficient evidence was presented to the Jury which would allow reasonable people to find that the supposedly legitimate reasons for adverse employment actions were pretextual. In fact, Ms. Webb's testimony alone gives rise to a *prima facie* finding of *quid pro quo* harassment, and further provides significant direct and circumstantial support for a finding that the District's attempted justifications are pretextual. In other words, assuming *arguendo* that the Defendants have successfully met the burden of production in explaining Paylor's adverse actions for *quid pro quo* discrimination, the Plaintiff has presented sufficient evidence that he intentionally discriminated against her.

Taken by itself, Ms. Webb's testimony demonstrates an adequate evidentiary basis for a finding of intentional sex discrimination. According to the Plaintiff, she dated Edward Paylor several times in the beginning of 1982, when she first started to work at the D.C. Department of Corrections. She stopped dating him after February, 1982, and although they parted on good terms, she had no direct contact with him for 10 years. Over the next decade, she worked in different areas of the Department, and while she did receive notices regarding improper use of leave, she had also been promoted and selected as "Officer of the Month." She also testified that she had drug problems and underwent drug treatment while employed at the Department, but she continued to receive satisfactory ratings.

The Plaintiff testified that Defendant Paylor called her in June, 1992, saying that he had heard she was having problems with her present supervisor, and offered to transfer her to Female Receiving and Discharge ("Female R & D") under his supervision. Female R & D processes inmates entering and leaving the D.C. Jail, logging their movements and handling their property. Paylor informed Webb that the job was at the same rate of pay, but that she would be able to earn "night differential" and "Sunday premium" pay, and that she would not have a problem with days off.

According to Webb, on her first day after her new assignment, Paylor told her that leave would not be a problem as long as her shift was covered. He then asked about their prior relationship, and indicated he was interested in resuming it. After she told him it was over, he asked if she had a boyfriend, to which she replied affirmatively and stated that she needed to move on. Paylor said "Okay, we'll see, Webb," wrote down his home, car phone and beeper numbers, and told her not to forget to use them. Afterwards, one of the Sergeants in the area grinned at her, saying "I see you're going to be a 'Paylorette.' "

On her second day on the job, Webb testified, Paylor called her at work, asking her if she needed anything. When she said no, he said "Yes, you do, you need me." She said she was not interested. Over the next few weeks, he frequently called her, and twice summoned her into the strip search office, grabbing her and kissing her.

Webb presented the Jury a vivid picture of the coercive, intimidating environment imposed upon her by her supervisor:

> Paylor called me from outside the jail and said that he wanted to talk to me and that he was "tired of my excuses." I said that I was busy and that I could not get any time off from work. He told me to ask Lt. Jones to let me leave early, and insisted that I come to his house. I did not feel comfortable going but I also felt that I would be able to handle whatever came up and that if I did not go things would get worse....
>
> ... He came and met me where I was waiting at a Giant parking lot. His first comment was that he would like to see me

out of uniform. This bothered me, but I followed behind Paylor in my car to his house because I didn't feel as if I could just leave from there.... I was surprised to see that he had prepared drinks. We sat down on the couch where we talked about work for a while. He began to fondle me and told me to "loosen up." I did not know what to do or what to say to him so I sat there for a few minutes and then told him it was time to go. I took my glass up to the kitchen where Paylor asked if he could ask me a question. Paylor then asked me whether I liked oral sex and why in our past relationship I had never performed oral sex on him. I didn't know what to say, so I replied that we weren't together long enough. Then I hurried to leave. He walked me to the car and I tried to change the subject by talking about his house. He started to talk about how he liked traveling, especially fishing, and I said I liked travel too. Paylor said "I am going to get to know you now." When I protested, he said "We'll see" and put his arms around me and kissed me good night as I turned to get in my car....

Direct Testimony of Joyce Webb at 13–15.

Webb further testified that her rejections seemed to make Paylor more insistent and threatening. In August, 1992, after telling her that he "would not take no for an answer," she met him outside work and again told him that he did not need her and could not have her. However, these attempts to spurn his advances did not dissuade her supervisor:

Whenever I tried to say no to him, he said something like "we'll see," and this frightened me because I felt no matter what I said he would not stop. I believed that if I challenged him I would have to suffer consequences. He kissed me when we left the Ramada Inn that night.

By September it became clear that he was angry at me because I was not willing to give in to him. He told me that I was playing games.

Direct Testimony of Joyce Webb at 16.

In its Motion, the Defendant District of Columbia lists *nine* examples of harassment, for which it claims it articulates a legitimate justification and for which it claims the Plaintiff failed to produce sufficient evidence to carry her burden of persuasion. The District correctly notes that Ms. Webb's testimony regarding adverse employment actions includes evidence that Paylor changed her days off against her wishes, intentionally slowed the processing of her disability papers, denied her request for continuation of payment, and unfairly singled out Webb for investigation of theft of inmate property.

Joyce Webb's disturbing depiction of Paylor's behavior provides more than sufficient support for a jury determination of *quid pro quo* discrimination. Her supervisor's persistent badgering for sexual favors, coupled with statements such as "Yes, you do, you need me," complaints that he was "tired of my excuses," and the refrain of "we'll see, Webb" indicates the sufficiency of the direct and circumstantial evidence before the Jury permitting a finding that the adverse employment actions taken against the Plaintiff were pretextual. More specifically, the sequence and timing of the degradation of the terms and conditions of Webb's employment—which occurred following Paylor's threats to go along with his sexual advances, and Webb's rejection of them—support a finding of *quid pro quo* discriminatory behavior.

In addition, Correctional Officer Barbara Johnson testified that while working under Paylor, she "observed that the individuals in the Records Office who received the best assignments from him were attractive females." Direct Testimony of Barbara Johnson, at 2. According to Johnson, other women who spent long periods of time in Paylor's office with the door shut were allowed to arrive late, leave early, and avoid answering the telephones. When Ms. Johnson complained to Paylor that one such woman, whose shift preceded Ms. Johnson's, had been improperly leaving inmate file jackets out of their files, he lost his temper, accused Johnson of being a chronic complainer, and transferred her.

Defendant District of Columbia has failed to persuade the Court that no evidence supports Webb's *quid pro quo* claim. In a re-

cent case, the Second Circuit directs the trial court's focus accordingly:

> The relevant inquiry in a *quid pro quo* case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances. It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions or privileges of the employee's job.

*Karibian v. Columbia University*, 14 F.3d 773, 778 (2d Cir.1994), *cert. denied*, —— U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). Here, the District's claim that there was no evidence of any implicit or explicit threats or promises simply does not match up with Webb's testimony. Moreover, while Paylor and other defense witnesses offered justifications for denying Plaintiff leave and other adverse employment actions, there was evidence before the Jury that the Plaintiff's leave requests where denied even though she had leave available and the leave requests for other employees were granted.

█ Furthermore, in its pleadings, the District improperly ignores the circumstantial evidence underlying Webb's employment relationship with Paylor. The District's observation that there was psychological testimony regarding the Plaintiff's view of reality is inappropriate in a motion for judgment as a matter of law. The District was afforded, and took advantage of, full opportunity to impeach the Plaintiff and her credibility during the trial; a post-trial motion is not the forum for such an attack, where a Court's assessment of the credibility of a witness is clearly inappropriate.

Similarly, it is the distinct province of a jury to reject Paylor's attempt to articulate nondiscriminatory explanations for his alteration of the terms and conditions of Ms. Webb's employment, following her rejection of his sexual advances and threats to comply. While *St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), unequivocally states that a Title VII plaintiff at all times bears the ultimate burden of persuasion,

> [t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination ...

*Id.* at ——, 113 S.Ct. at 2749 (footnote omitted). The Court finds that there was sufficient direct and circumstantial evidence for the Jury to arrive at a finding of discrimination.

### 3. THE DISTRICT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S CLAIM OF HOSTILE WORK ENVIRONMENT.

█ The District also argues that the Jury's finding against the District on the Plaintiff's claim of hostile work environment is faulty because of an insufficiency of evidence regarding notice to the District. As Ms. Webb recounted in detail at the trial, her work environment included continual harassment by telephone, demands for sex, physical attacks, and threats in various forms. As such, no Defendant disputes that a reasonable jury may have found that Ms. Webb worked in a hostile environment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Rather, the District tries to argue that it had no knowledge, nor reason to know, of this abusive environment. The Court finds that sufficient evidence of knowledge or reason to know was before the Jury, and therefore upholds the Jury's finding on this claim.

In *Meritor*, the Supreme Court held that sexual harassment in the form of a claim of "hostile environment" is actionable under Title VII. *Id.* at 65, 106 S.Ct. at 2404–05. That decision went on to interpret Title VII to mean that "Congress' decision to define 'employer' to include any 'agent' of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." *Id.* at 72, 106 S.Ct. at 2408. *Meritor* did establish certain boundaries of employer responsibility, stating that strict liability on employers

for the acts of their supervisors are inappropriate, but declaring that "absence of notice to an employer does not necessarily insulate that employer from liability." *Id.* However, the Supreme Court declined to provide definitive guidelines for determining employer liability for a hostile work environment, directing the courts to apply agency principles in delineating the gray area. All parties to this case, including the District, agreed to the Court's Final Jury Instructions regarding the District's liability for a hostile work environment, holding the District responsible if

> its officials knew or had reason to know of the hostile environment, and despite knowing or having reason to know, failed to take prompt and effective measures to correct it. You may consider the District's policy, practice or procedure regarding sexual harassment and whether the District reasonably implemented that policy.

Final Jury Instructions at 16.

There was a considerable amount of evidence that would enable a jury to find the District liable on the Plaintiff's claim for hostile work environment. Once again, Ms. Webb's testimony regarding Paylor's behavior towards her may enable reasonable individuals to find the District liable, because Paylor himself is a high-ranking supervisor whose knowledge of the abusiveness of Webb's work environment is evidence that the District had such knowledge. Although our Circuit has not squarely addressed this issue, the Second Circuit followed other Circuits in recently holding "that an employer is liable for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship." *Karibian v. Columbia University,* 14 F.3d at 780 (citing Restatement (Second) of Agency § 219; *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 579 (10th Cir.1990); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1559–60 (11th Cir. 1987); *Watts v. New York City Police Dep't,* 724 F.Supp. 99, 106 n. 6 (S.D.N.Y.1989)); *see also Kotcher v. Rosa and Sullivan Appliance Center,* 957 F.2d 59 (2nd Cir.1992) ("At some point ... the actions of a supervisor at a sufficiently high level in the hierarchy would necessarily be imputed to the company."). In arriving at this result, *Karibian* distinguished this holding from a situation where a low-level supervisor does not use his supervisory authority to carry out the harassment. Here, there is no question that, with 80 employees under him, Paylor is not a "low-level" supervisor but in a position of considerable power, and that Webb's testimony indicated that by ordering her to his house and attacking her at work he used his supervisory role to create her abusive environment.

In *Rauh v. Coyne,* 744 F.Supp. 1186 (D.D.C.1990), Judge Harold Greene relied on two additional bases for agency liability which lend support to the Jury's finding that the District is responsible for the hostile work environment. "Employers have been held liable on such a basis for hostile work environment harassment where the harassing employee had decision-making authority or authority to alter the plaintiff's employment status." *Id.* at 1189–90 (citations omitted). There is no question that Paylor had such authority over the Plaintiff and her employment status.

In addition, relying on § 219(2)(d) of the Restatement (Second) of Agency for the proposition of derivative liability where a tortfeasor is aided in accomplishing the tort by virtue of the agency relationship with the employer, *Rauh* found the defendant management corporation and hotel owner liable where the hotel's director of operations was able to harass the plaintiff "only because he had a key allowing him to enter the locked PBX room where she worked." *Id.* at 1190. Similarly, a jury could have found liability against the District in the instant case where there was evidence that Paylor attacked Webb in a limited-access strip search room and otherwise relied on the agency relationship for harassment.

Pursuant to this approach of authority-based liability, there was evidence that the District should have been on notice, in light of testimony that the District's procedures designed to eliminate sexual harassment had not been properly implemented. Defense witness Fred Staten, the Equal Employment

Opportunity Officer for the Department of Corrections, told the Jury of certain policies and procedures of the District and Department prohibiting sexual harassment by Department officials and employees. The implementation of these policies includes educational aspects, such as mandatory annual supervisory training in sexual harassment policy. Mr. Staten testified that Paylor had been scheduled for such training three times in 1993, but that he never received it. According to Staten, Paylor missed these training sessions on account of illness or annual leave, but a jury may legitimately base its findings of liability on the evidence that the District failed to comply with its own requirements for training.

Furthermore, there was considerable evidence that the District was on notice of a hostile work environment under Paylor. This evidence includes questioning of Paylor by Plaintiff's counsel regarding a 1983 claim for sexual harassment, the settlement of which resulted in a ten-day suspension; complaints filed with the District of Columbia's Office of Human Rights in 1986 and 1991; two pending complaints filed in 1992; and evidence that Teresa Washington and Renee Rivers had talked to higher officials about Paylor. In its Motion, the District attempts to discredit this evidence on a piece-by-piece basis, arguing that the 1983 complaint was too old, and that the 1986 and 1991 complaints were found to be without merit and do not establish notice. However, taken together, along with the Court's limiting instruction regarding certain evidence[2], this pattern of evidence is sufficient for a jury to find that the District and its officials should have been on notice of the hostile environment, or that the District failed to take prompt and corrective measures to correct it.

Accordingly, the District has failed to prove that no reasonable person, viewing the evidence in the light most favorable to Webb, could find that the District is liable for Webb's hostile work environment.

## IV. THE DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT SIGNIFICANTLY PREJUDICIAL OR IMPROPER ERRORS WERE MADE, AND THEREFORE THE DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL.

In the alternative to a judgment notwithstanding the verdict, Defendant District of Columbia moves for a new trial or remittitur, and Defendant Paylor filed a separate motion seeking a new trial. In requesting a new trial, both Defendants rely on Rule 59(a) of the Federal Rules of Civil Procedure. More specifically, Paylor argues that the weight and sufficiency of evidence regarding liability and damages do not support the Jury's Verdict, and even goes so far as to say that "[a]n undeniable reality is that the evidence of 'prior bad acts' cast a pall over the trial." Def. Paylor's Motion for a New Trial at 12. Similarly, Defendant District of Columbia asserts that "significant errors were made in admitting unsubstantiated and unduly prejudicial evidence and in submitting to the jury a verdict form allowing separate damages to be entered against each defendant." District's Motion at 3. However, because the Defendants have not met their heavy burden of showing that the Jury was misled or confused as to the submission of evidence and submission of the Verdict Form, the Court shall deny their Motions for a New Trial on this basis.

To protect the jury's function in the judicial system, courts should not grant new trials without a solid basis for doing so. See Lewis v. Elliott, 628 F.Supp. 512, 516 (D.D.C.1986) ("In deciding whether to grant a new trial, the court should be mindful of the jury's special function in our legal system and hesitate to disturb its finding.") (citations omitted). Accordingly, as a general practice, "a Rule 59(a) motion should be granted only where the court is convinced that the jury verdict was a 'seriously erroneous result' and where denial of the motion will result in a

---

**2.** To reduce any prejudice, the Court informed the Jury that the testimony of Officer Sharon Bonds and Ms. Theresa Washington "is offered only to show Mr. Paylor's motive or intent, and that the District of Columbia may have had prior notice of sexual harassment in the Department of Corrections." Final Jury Instructions at 4. This instruction was given both during the trial, and during the jury charge.

'clear miscarriage of justice.'" *Sedgwick v. Giant Food, Inc.*, 110 F.R.D. 175, 176 (D.D.C.1986) (citations omitted); *see also Lewis*, 628 F.Supp. at 516 ("if the court after considering all the evidence and the jury's verdict is left with the 'definite and firm conviction' that a mistake has been committed, it should grant a new trial.") (citations omitted).

### A. IN LIGHT OF THE FEDERAL RULES OF EVIDENCE, THE CONTROLLING CASELAW, AND THE COURT'S LIMITING INSTRUCTION, THE COURT'S ADMISSION OF EVIDENCE OF "PRIOR BAD ACTS" DOES NOT WARRANT A NEW TRIAL.

In an attempt to persuade the Court that a new trial is justified, the Defendants focus on what they believe to be the improper admission of Paylor's "prior bad acts." They argue that the testimony from other present and former D.C. Correction Officers, who claim to have been discriminated against or harassed by Paylor, should not have been admitted. Furthermore, they argue that the prejudice, remoteness, and dissimilarity of the evidence overwhelmed the Court's attempt to cure these problems through a limiting instruction.

Specifically, the District argues that the Court erred in permitting testimony of allegations of harassment by Paylor against (1) Sharon Bonds, who testified regarding events that occurred in 1990; (2) Teresa Washington, who testified regarding events which occurred in 1991; and (3) Barbara Johnson, who testified regarding events taking place in the latter portion of 1992. Furthermore, the District also contends that the Plaintiff should not have been allowed to ask Paylor about prior claims by Renee Rivers and Joan Farley, nor should Plaintiff's counsel have been allowed to read to the Jury a **stipulation** concerning the claim of Juanina

Harris. "The acts were either too far distant in time, not similar enough in substance, or not supported by a finding of clear and convincing evidence of guilt by the accused of the 'prior bad acts.'" District's Motion at 7.

The Defendants' arguments are not supported by law. All parties agree that Rules 403 and 404(b) of the Federal Rules of Evidence apply. However, neither Defendant cites any relevant Title VII precedent for support. In his Motion, Paylor chose not to rely on any caselaw to support the application of these rules. The District relies primarily on criminal cases, particularly *Boyer v. United States*, 132 F.2d 12 (D.C.Cir.1942). In explaining its legal approach, the District informs the Court in a footnote that the Rule 404(b)'s application and interpretation is the same for both civil and criminal cases, and that "[t]he cases cited in the body of the brief are criminal in nature because they delineate in much greater detail and specificity than the civil cases what is required of the 'prior bad act' evidence to be relevant and admissible." District's Motion at 6 n. 2. However, cases such as *United States v. Foskey*, 636 F.2d 517 (D.C.Cir.1980), in which the D.C. Circuit granted a new trial where the trial court improperly admitted evidence of an arrest from two-and-a-half years earlier, are not persuasive here; the potential prejudice of a prior *arrest* is qualitatively greater than any risk of prejudice from an EEOC complaint.[3]

Because they did not bring to the Court's attention the extensive body of civil caselaw regarding the admissibility of prior bad acts in Title VII discrimination cases, neither Defendant should be surprised to learn that the Court shall follow these relevant cases, and that this jurisprudence supports the denial of the Defendants' request for a new trial.

Consistent with the Court's rulings in this case, a variety of courts "have held that *prior* discriminatory conduct is recognized as probative in an employment discrimination case

---

**3.** The District also cites *United States v. Shelton*, 628 F.2d 54, 56 (D.C.Cir.1980) for the proposition that a court must make a preliminary finding of "clear and convincing evidence" that a defendant committed the alleged prior bad acts. However, like so many of the cases upon which the District relies, *Shelton* is a criminal case

which specifically requires such a finding where there is an *"alleged crime." Id.* (emphasis in original). In *Shelton*, the prosecutor portrayed the defendants as "seedy and sinister characters" by innuendo. In sharp contrast to such cases, there is no prosecutor, no criminal defendant, and no accusations of criminal behavior here.

on the issue of motive or intent." *Brown v. Trustees of Boston University*, 891 F.2d 337 (1st Cir.1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). In the often-cited Seventh Circuit decision of *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417 (7th Cir.1986), Judge Posner upheld the entry of a verdict based upon a jury's finding that an employer harassed and retaliated against a black employee, in violation of Section 1981 and Title VII. The reasoning and factual similarity of *Hunter* and similar cases leads this Court to the similar conclusion that its admission of the evidence does not warrant a new trial. *See Morris v. Washington Metropolitan Area Transit Authority*, 702 F.2d 1037, 1045 (D.C.Cir.1983) ("The question of the legitimacy of the employer's motivation in firing the employee ... is one upon which past acts of the employer has some bearing.").

Federal Rules of Evidence 403, 404, and the relevant caselaw interpreting them support the Court's admission of the challenged evidence. The Defendants rely heavily on Rule 404(b) of the Federal Rules of Evidence to argue that the testimony regarding prior bad acts should have been excluded. Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." While all the parties recognize that this Rule explicitly states that such evidence "may, however, be admissible for other purposes, such as proof of motive, identity, or absence of mistake or accident ...," the District argues that the prior acts should only be admitted where they prove motive or intent immediately preceding the conduct in question. The Court must reject the Defendants' reliance on this Rule for a variety of reasons.

■ First, regarding any allegations of harassment towards Ms. Farley in 1983, and towards Juanina Harris in 1986, the District is mistaken in contending that such evidence was improperly admitted due to remoteness in time. Because testimony from these two women regarding the broader circumstance concerning incidents involving Paylor were not admitted, there was no 404(b) violation. For the issue of notice to the District of Columbia—an essential element of the hostile environment claim—the Court did permit

evidence regarding the existence of their complaints, but the Jury was informed that a Consent Agreement was signed in Ms. Farley's case, and a finding of "no probable cause" resulted in Ms. Harris'. *No* tawdry details of allegations of misconduct were admitted.

■ Consonant with exceptions for notice, motive, and intent, three women were allowed to testify regarding events that took place within the past few years of the misconduct alleged in this case. Despite the District's contentions, the testimony each of them gave at trial was highly probative and relevant. Rather than being admitted for the purpose of propensity, Ms. Johnson's testimony provided direct evidence of a contemporaneous hostile environment regarding preferential treatment toward attractive women. Similarly, Ms. Washington's testimony concerned substantially similar behavior when compared with those acts alleged by Ms. Webb as well as contemporaneous harassment, thus pertaining both to intent as well as to a hostile working environment. Likewise, Ms. Bonds testified that Paylor recently treated her in a substantially similar way to that of Ms. Webb.

Despite the Defendants' claims, no other evidentiary rule supports their challenge to the Court's admission. Rule 403 grants the trial judge considerable discretion in determining the balancing of the prejudicial and probative effect of this kind of evidence. As that rule states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Federal Rules of Evidence, Rule 403. Despite the Defendants' claim that Rule 403 bars testimony in this instance, Judge Posner's explanation of the propriety of the admission of evidence under Rule 403 is especially pertinent here:

> Given the difficulty of proving employment discrimination—the employer will deny it, and almost every worker has some deficiency on which the employer can plausibly blame the worker's troubles—a flat rule

that evidence of other discriminatory acts by or attributable to the employer can never admitted without violating Rule 403 would be unjustified. Such evidence will often flunk Rule 403 because the acts are remote in time or place, . . . but not in all cases, and not in this one. The evidence was relevant both in showing that Allis–Chalmers condoned racial harassment by its workers and in rebutting Allis–Chalmers' defense that it had fired Hunter for cause. The evidence disclosed a strong and persistent pattern of racial hostility that management could hardly have been unaware of and that increased the probability that Hunter's record-keeping irregularities were merely the pretext for the harsh discipline meted out to him by his complaints about racial harassment.

*Hunter,* 797 F.2d at 1423–24. As in *Hunter,* the difficulties in proving discriminatory intent significantly heightens the probative value of statements revealing the employer's attitude toward the employee. *See Mullen v. Princess Anne Volunteer Fire Co., Inc.,* 853 F.2d 1130, 1133 (4th Cir.1988) (explaining the high probative value of admitting racial slurs as evidence of racial animus "because of the inherent difficulty of proving state of mind").

■ Moreover, and perhaps most importantly, the Court anticipated and addressed the 404(b) and 403 issues through a limiting instruction, minimizing any prejudice by informing the Jury that the testimony of Officer Sharon Bonds and Ms. Teresa Washington "is offered only to show Mr. Paylor's motive or intent, and that the District of Columbia *may* have had prior notice of sexual harassment in the Department of Corrections." Final Jury Instructions at 4 (emphasis added). This instruction was given both during the trial, *and* during the jury charge. The limiting instruction and limitations on the scope of testimony minimized the prejudice, and thus, the Court was well within its discretion in ruling that Rule 403 did not compel the exclusion of the challenged testimony.

In addition, several of the defense witnesses testified to the effect that Paylor did not commit the tortious and discriminatory acts charged. The testimony regarding Paylor's prior conduct allowed the Plaintiff the opportunity to present evidence of prior inconsistent behavior with the testimony of the defense witnesses.

■ The District also argues that the Defendants were prejudiced because they were "unprepared" to rebut any testimony regarding "prior bad acts" due to the Court's pretrial order instructing the parties to stipulate as to the existence of the alleged "bad acts." The Court finds that the District's claim of being "surprised" is unfounded. First, as the Plaintiff points out, she had identified Joan Farley, Sharon Bonds, Barbara Johnson and Teresa Washington in Answers to Interrogatories more than three months before trial, and through affidavits. The class action filed against the District by Ms. Bonds and Ms. Washington, who are named representatives, was initiated several months before trial. Additionally, the District had exclusive custody of the document concerning Renee Rivers, at the insistence of the Plaintiff. Moreover, despite the Court's best efforts to avoid evidentiary problems by encouraging the parties to stipulate as to the pertinent facts regarding notice, the Court made no dispositive ruling on this issue. In light of its knowledge of the uncertainty, neither of the Defendants can legitimately claim surprise when the stipulation process breaks down at the eleventh hour.

Accordingly, the Court acted within its discretion in permitting the testimony of Bonds, Washington, and Johnson. While the Court forthrightly told all parties that this case would not be a mini-trial on past allegations regarding Paylor's misconduct, the testimony of these three women were clearly relevant to (1) the District's notice of a working environment hostile to women under Paylor, and (2) Paylor's intent in discriminating and inflicting emotional distress. Therefore, the Defendants do not meet their heavy burden of showing that any prejudice "substantially outweighed" the obviously probative value of this testimony.

### B. TERESA WASHINGTON'S TESTIMONY NEED NOT HAVE BEEN STRICKEN.

The Defendants argue that even if Ms. Washington's testimony regarding "prior bad acts" were admissible, she exceeded the limitations of motive or intent. They claim that her testimony should be stricken because it

contained numerous unsubstantiated and inflammatory remarks, and because she improperly consulted with her attorney during a recess between her direct and cross-examination. More specifically, they charge that she was uncontrollable on the witness stand, and that after she violated the Court's instruction not to leave the area surrounding the witness box during a recess, she wrongly blamed a legal intern for giving her permission to do so. However, due to the Court's limiting instruction, the cross-examination of the witness, and the testimony of that intern, the Court's denial of this Motion will not result in a "clear miscarriage of justice." *Sedgwick v. Giant Food, Inc.,* 110 F.R.D. 175, 176 (D.D.C.1986).

The Defendants' argument that Ms. Washington gave testimony beyond the limited scope of "prior bad acts" by Paylor is undisputed—Ms. Washington did testify regarding contemporaneous bad acts of Paylor. However, out of an abundance of caution, the Court promptly and appropriately instructed the Jury to disregard her testimony regarding EEOC violations, even though that testimony may have been relevant regarding Ms. Webb's claim of a hostile environment. There are no indications that the Jury failed to follow these instructions, as well as the instructions concerning the effect of a "probable cause" finding by the EEOC, and the Defendants had a fully opportunity to cross-examine Ms. Washington concerning her testimony. Furthermore, the Defendants had, and took advantage of, their opportunity to impeach Ms. Washington's credibility through their examination of the legal intern in front of the Jury, who denied giving Ms. Washington permission to leave the witness stand.

### C. THE DEFENDANTS ARE NOT ENTITLED TO EITHER A NEW TRIAL OR A REMITTITUR ON THE BASIS OF THE COURT'S ADMISSION OF TESTIMONY FROM DR. BREESKIN AND DR. BORZILLERI, OR THE COURT'S SUBMISSION TO THE JURY OF SEPARATE DAMAGE INTERROGATORIES FOR EACH DEFENDANT.

The District seeks a new trial, or, in the alternative, a remittitur, on the grounds that the Court improperly admitted certain opinion testimony and that the Court's verdict form submitted to the Jury was also improper. While Paylor only requests a new trial and not a remittitur, he joins the District in challenging the Court's admission of testimony from the Plaintiff's psychologist. Again, the Court must reject the Defendants' arguments as they are wholly without merit.

 The Court of Appeals for this Circuit has employed two tests for determining whether a jury verdict is excessive and warrants remittitur: (1) "whether the verdict is 'beyond all reason, or ... is so great as to shock the conscience'" or (2) "whether the verdict 'is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.'" *Jeffries v. Potomac Development Corp.,* 822 F.2d 87, 96 (D.C.Cir.1987) (citations omitted). Especially where damages due to pain and suffering are involved, many damages are difficult to quantify and should be left to a jury's discretion. In considering the facts and testimony, especially the allegations of sexual assault and pervasive harassment, the Court cannot rule that the Jury's findings warrant a new trial, nor can it conclude that the verdict shocks the conscience.

### 1. THE COURT'S DENIAL OF THE DISTRICT'S MOTION TO STRIKE THE TESTIMONY OF THE PLAINTIFF'S PSYCHOLOGIST, DR. BREESKIN, AND THE DISTRICT'S MOTION TO STRIKE THE TESTIMONY OF PLAINTIFF'S ECONOMIC OPINION WITNESS, DR. BORZILLERI, WAS APPROPRIATE AND CONSISTENT WITH THE RULES OF EVIDENCE.

The District argues that the Court erred in denying the District's motion to strike the testimony of Dr. John Breeskin, the Plaintiff's psychologist, and Dr. Thomas Borzilleri, an economist who testified as an opinion witness for the Plaintiff. More specifically, the District asserts that Dr. Breeskin was unable to give an opinion, to a reasonable

degree of psychological certainty, that the alleged harassment was a "substantial factor" underlying the Plaintiff's psychological problems, and that Dr. Borzilleri had an insufficient foundation for his testimony regarding pension loss. Paylor also challenges Dr. Breeskin's testimony as being "highly speculative." In light of the relevance and foundation of the testimony of these witnesses, the Court finds that their admission was appropriate and certainly does not warrant a new trial.

In seeking to overturn this Court's admission of the testimony of Dr. John Breeskin, the Court concludes that the District relies on the incorrect standard of law regarding psychological certainty, and misapplies it. The Defendant points to an assortment of cases, such as *Stewart v. Bepko*, 576 F.Supp. 182 (D.D.C.1983) (Greene, J.), *aff'd*, 735 F.2d 617 (D.C.Cir.1984) for the proposition that "[t]aken together, these opinions clearly show that the generally-accepted standard requires the plaintiff's expert to state, to a reasonable degree of certainty, that the defendant's actions were a substantial factor in causing the injury in question." District's Motion at 15. The District then contends that Dr. Breeskin fails to meet the necessary standard of medical certainty due to his recognition that other factors in the Plaintiff's life, such as sexual abuse by her father, caused her problems. However, in making this argument, the District amalgamated fragmented statements from cases such as *Stewart*, which did hold that to prove causation a plaintiff had a burden to produce opinion testimony to a reasonable degree of medical certainty, *but*, which restricted its holding to medical malpractice cases.

 Under the Federal Rules of Evidence and the Supreme Court's pronouncement on scientific evidence in *Daubert v. Merrell Dow Pharmaceuticals*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Dr. Breeskin's evidence was properly admitted. According to *Daubert*, where there is a proffer of expert scientific testimony, "the trial judge must determine ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."

*Id.* at ——, 113 S.Ct. at 2796 (citations omitted). Therefore, the District's emphasis on whether a psychologist says the magic words "substantial factor" is misplaced. As *Daubert* indicated, *id.* at ——, 113 S.Ct. at 2795, Fed.R.Evid. 702 presents the trial judge's primary obligation in admitting evidence: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In contrast to a fact witness, under Fed.R.Evid. 702 and 703, "an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation." *Daubert* at ——, 113 S.Ct. at 2796. The District can point to no evidentiary rule in the Federal Rules of Evidence or this Circuit's precedent warranting the "substantial evidence" or "substantial factor" standard it advocates for causation, and Dr. Breeskin clearly has scientific knowledge regarding the issues of degree of psychological trauma and relationship of that injury to the Defendants' behavior.

 Even under the District's incorrect, unduly high standard for expert testimony, the Court's denial of the District's request to strike Dr. Breeskin's statements is supported by Dr. Breeskin's testimony:

[I]t is my opinion, to a reasonable degree of psychological certainty, that her supervisor's sexually abusive conduct had tapped in to [*sic*] deeply repressed emotions about her childhood abuse. Although Ms. Webb had previously confronted many significant stressors in her life successfully, it was the re-exposure to unwanted sexual demands by a person with authority over her that destroyed the coping mechanisms that she had constructed over the years, and caused her to react so severely to the harassment at this time.

. . . .

[I]n my opinion it is clear that there was a direct causal relationship between Ms. Webb's PTSD and the incidents where her supervisor made advances to her and later took punitive actions when she refused.

Direct Testimony of Dr. John Breeskin, at 5, 8. These statements alone are enough to permit a reasonable jury to find causation in effecting injury. As the Plaintiff points out, the District's argument that the Jury's Verdict on damages cannot be sustained due to the absence of a causal connection between the Defendants' behavior and her psychological injury runs contrary to *Harris v. Forklift Systems, Inc.*, —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), which held that psychological injury is not required to prove that a hostile environment exists. Furthermore, the Court's admission of this testimony is also supported by Fed.R.Evid. 704, which allows experts to render an opinion on the ultimate issue to be decided by the trier of fact. Where the Defendants had a full opportunity to cross-examine Dr. Breeskin, and the Jury was instructed that it could reject all or none of this testimony, Dr. Breeskin's statements were properly admitted under *Daubert* and the Federal Rules of Evidence.[4]

 Similarly, the Court's decision not to bar or strike the testimony of Dr. Borzilleri regarding pension loss was well within the Court's discretion. Despite the District's assertion that his testimony regarding Ms. Webb's possible pension losses of $341,306 (if she did not return to the Department) or $243,430 (if she worked elsewhere in the federal government) was highly prejudicial and without foundation, Dr. Borzilleri properly qualified his calculations on the best data that was available to him. Dr. Borzilleri did not present the potential economic loss as an undisputed fact, but stated his opinion to a reasonable degree of economic certainty, and carefully qualified his projections on assumptions that she might not return to the Department of Corrections or any other job. In addition, he candidly informed the Jury to disregard these numbers if the Jury believed she could return to the Department. Further, defense psychiatrist Dr. Carol Klein-

man agreed that Ms. Webb was incapable of returning to work at once.

Similarly, the District's claim that Dr. Borzilleri lacked sufficient foundation for his testimony is unpersuasive. As the Plaintiff revealed in her Opposition, the District was not responsive to her attempts to obtain from the District the calculation methods of the Department's pension plan. Accordingly, with the permission of the Corporation Counsel, Dr. Borzilleri contacted the District of Columbia's Office of Personnel Management shortly before trial, and based his calculations on the information received from that office. Any updated calculations on the witness stand was a consequence of the last-minute information accessible to him, and was not of a nature that would unfairly surprise the Defendants. Therefore, in light of the Court's final instruction reminding the Jury that it could disregard the testimony of any witness, the Defendants' cross-examination attacking his testimony, the lack of dispute that the Plaintiff could not return to work and the uncertainty of when, if ever, she could, the admission of the testimony of an experienced economist regarding Ms. Webb's possible pension loss is not prejudicial error.

### 2. BECAUSE THE VERDICT WAS NEITHER EXCESSIVE NOR INORDINATELY LARGE, THE DEFENDANTS' REQUEST FOR REMITTITUR OR NEW TRIAL SHALL BE DENIED.

 The District also asserts an argument regarding damages, challenging the Court's submission of separate damage interrogatories for each Defendant. According to the Defendant, the Jury's Verdict of $225,000.00 against the District and $75,000.00 against Paylor is inconsistent because all of the Plaintiff's damages were caused by Paylor's acts.

---

4. In a footnote, the District raises an allegation that there may be a basis to strike Dr. Breeskin's testimony because he testified on a contingent-fee basis. This assertion must be rejected for two reasons. First, Dr. Breeskin testified that he does not reject patients on the basis of their inability to pay for his treatment. While Ms. Webb's damage award may result in his being paid for that treatment, this is not the classic sort of contingent-fee arrangement, and Plaintiff's

counsel had no part in arranging such a payment. Second, even if it were, while "[i]t is unethical for a lawyer to employ an expert witness on a contingent-fee basis ... it does not follow that evidence obtained in violation of the rule is inadmissible. The trier of fact should be able to discount for so obvious a conflict of interest." *Tagatz v. Marquette University*, 861 F.2d 1040, 1042 (7th Cir.1988) (citation omitted).

However, the Court's creation and submission of the Verdict Form was well within its discretion, and the record supports the Jury's determinations. The District's claim that "[t]here is no evidence that any District official, other than defendant Paylor, caused plaintiff's purported injuries," District's Motion at 39, is simply erroneous, and much of it is the reargument of its Motion for Judgment as a Matter of Law. The Plaintiff submitted to the Jury considerable evidence that the Department of Corrections failed to enforce its anti-harassment policy and training, and that the Department failed to react properly to the prior harassment accusations against Paylor. In addition, there is considerable evidence that as a high-ranking official, notice to Paylor of a hostile environment constitutes notice to the District. Moreover, as even the District recognizes, the Court did instruct the Jury not to award double damages. *See* Final Jury Instructions at 28.

In this instance, the trial court would be exceeding its role in ruling that Paylor was exclusively or primarily responsible when the Jury found the District was directly responsible for much of the Plaintiff's injuries. Accordingly, because the submission of the Verdict Form does not warrant a new trial, and because the Verdict of $225,000.00 was not inordinately large or shocking to the conscience, the Jury's verdict shall stand.

Paylor also argues that the Court should grant his Motion for a New Trial because the evidence of trauma and harm were "overreaching" and "speculative," and because the Court's instructions regarding damages were faulty. In support of this contention, counsel for Paylor lists various items of evidence which he represents to be probative of the impropriety of the Jury's damage award. However, the Court finds that the trial evidence of causation supported the damages awarded and that the instructions to the Jury were clear, appropriate, and proper.

■ There is no question that there was sufficient evidence for a reasonable jury to find that Paylor's behavior caused the Plaintiff's trauma. As stated *supra*, Dr. Breeskin's testimony included the statement that "[a]lthough Ms. Webb had previously confronted many significant stressors in her life

successfully, it was the re-exposure to unwanted sexual demands by a person with authority over her that destroyed the coping mechanisms that she had constructed over the years, and caused her to react so severely to the harassment at this time." Direct Testimony of John Breeskin, Ph.D. at 4–5. Furthermore, defense witnesses Dr. Carol Kleinman and Dr. Kenneth Gaardner also testified that Paylor was at least a contributing cause of her distress. In addition, a great deal of lay evidence from Plaintiff Webb herself, Mr. Bridges, Sgt. Powe, and Teresa Washington, among others, as well as the records and notes of the Associated Mental Health Professionals, supported the Plaintiff's contention of causation. Paylor's attempt to impeach the Plaintiff and her witnesses in his Motion for New Trial cannot withstand the sufficiency of the evidence contained in the trial record.

In requesting a new trial on the ground that an instruction for damages was unfairly denied him but given to the District, Paylor misstates the instructions actually given by the Court to the Jury. According to Paylor, the Court prejudiced him by instructing the Jury that the District was not responsible for harm caused by Ms. Webb's history of drug abuse, miscarriages or other similar life experiences, but prejudicially failed to apply the instruction to him. In fact, the Court *did* apply this instruction to both Defendants:

In making this determination [that the Plaintiff actually found the conduct or words to be unwelcome, hostile, or abusive], you should consider all of the relevant circumstances that are in evidence. While the Plaintiff need not show that the offensive conduct or words affected her psychological well-being in order to succeed on her claim, doing so could be a factor in concluding that the Plaintiff actually found the working environment to be abusive. You may also consider evidence of whether the Plaintiff herself was more or less likely than any other person to experience the environment as abusive by reason of her past experience, personal attributes and behavior. On the other hand, *neither of the Defendants* are responsible for the Plaintiff's past sexual abuse by her father, rape, multiple miscarriages, borderline intelligence, or drug and

alcohol abuse, in the form of cocaine, marijuana, or PCP.

Final Jury Instructions at 16 (emphasis added). As the Plaintiff observes, this recitation of her past is less prejudicial to the Defendants than the Plaintiff. Paylor can have no complaint with this instruction which equally favors *both* Defendants, and was given twice in the final Charge to the Jury. *See also id.* at 23.

## V. THE COURT SHALL AWARD THE PLAINTIFF THE MAJOR PART OF THE INJUNCTIVE RELIEF SHE SEEKS, BUT SHALL DENY HER REQUESTS FOR PUNITIVE DAMAGES AND AMENDMENT OF JUDGMENT, AND SHALL DISMISS ALL REMAINING CLAIMS.

In the Plaintiff's post-trial motion styled Motion for Entry of Judgment, to Amend Judgment, and For Additional Relief, she voluntarily dismisses Count III (42 U.S.C. § 1983—First Amendment Violation) and Count V (Assault & Battery) of her First Amended Complaint, and moves this Court for entry of judgment as to Counts I (42 U.S.C. § 1983, *Quid Pro Quo* Discrimination), II (42 U.S.C. § 1983, Hostile Environment), and VII (Negligent Supervision and Selection of Officials). In addition, she renews her request for punitive damages, despite the Court's denial of this request at the conclusion of the Plaintiff's case-in-chief, and seeks injunctive relief.

The Court finds that the Jury's Verdict and the evidence at trial warrant further injunctive relief, but that punitive damages would be inappropriate and contrary to law. Furthermore, because the Plaintiff does not seek further compensatory damages, is not entitled to punitive damages, and may not seek further injunctive relief in this Court, her remaining claims must be dismissed.

### A. THE COURT SHALL AWARD THE PLAINTIFF THE MAJOR PART OF THE INJUNCTIVE RELIEF SOUGHT BY THE PLAINTIFF, BUT MUST DENY THE PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES.

The Plaintiff further moves the Court to award her various forms of injunctive relief.

Under Title VII cases where there is a finding of unlawful employment practices, "the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate...." 42 U.S.C. § 2000e–5(g). In its discretion, and in the interests of justice and fairness, the Court shall grant the Plaintiff the bulk of the injunctive relief requested, and shall further order that Defendant Paylor, and all others similarly situated, receive sensitivity training in accordance with the Department's stated policy.

 In her post-trial Motion, the Plaintiff requests four forms of injunctive relief:

1. An award of attorney's fees and costs as set forth in plaintiff's previously-filed Application for Attorney's Fees and Costs, which will be supplemented to include the costs of opposing defendants' motion(s);

2. An Order requiring the Defendants to refrain from sexual harassment, sex discrimination or retaliation in any form against Joyce Webb, and to take appropriate remedial action to prevent harassment or retaliation by Edward Paylor, punishable by contempt;

3. An Order requiring the Defendants to offer Ms. Webb a job assignment appropriate to her medical condition and under circumstances where she will not be subjected to sexual harassment by Edward Paylor or any person under his direct or indirect control, with retention of jurisdiction by the Court to ensure that no further acts of retaliation are taken against her or any witness who testified on her behalf; and

4. Expungement of all absences without official leave or other disciplinary action against Ms. Webb during the period of December 1, 1992 until the date she returns to work, and conversion of the same to leave without pay, and restoration of her seniority, all leave consumed as a result of defendant's placing her on AWOL, and all other benefits, emoluments and privileges of her employment.

Pl.'s Motion at 19. With regard to the Plaintiff's request for attorney's fees, the Court shall withhold judgment, and hereby directs the parties to submit supplemental pleadings to update the costs of the recent filings. With regard to the Plaintiff's second and third requests for a protective Order and reinstatement, in order to return the Plaintiff to her position prior to the Defendants' tortious and illegal conduct, the Court shall grant these requests.[5] In doing so, the Court emphasizes that such reinstatement shall only take place when her treating physicians determine that she is ready and able to return to work. Furthermore, the Court hereby directs that her position of employment be outside of Edward Paylor's supervision and direct or indirect chain of command.

■ In addition, the Court further orders the D.C. Department of Corrections to comply with the policies and procedures of the District and Department that are designed to prohibit sexual harassment by Department officials and employees. Not only must the Department follow these procedures, but it must also pay particular attention to ensuring that Edward Paylor undergo sensitivity training.

■ Plaintiff's request for expungement of all AWOL entries shall also be denied. The Jury's Verdict is unclear as to which, if any, of the AWOL entries were discriminatorily entered, and there was sufficient testimony at trial to convince the Court that at least some of these entries were legitimate. Accordingly, because of the conflicting testimony in the record, in the exercise of the Court's discretion, the Court finds that the entry of an order expunging all AWOL and other disciplinary actions from the Department's records would not be appropriate.

■ The Court finds no basis for granting punitive damages. First, the Court has previously denied this claim, meaning that neither Defendant has had an opportunity to defend against it. Second, as against the District, "as a general rule there can be no recovery of punitive damages against a

municipality absent a statute expressly authorizing it." *Smith v. District of Columbia,* 336 A.2d 831, 832 (D.C.1975). No such statute authorizes punitive damages. As the D.C. Court of Appeals explicitly stated in applying *Smith,* "punitive damages may not be awarded against the District of Columbia." *Finkelstein v. District of Columbia,* 593 A.2d 591, 599 (D.C.1991); *see also O'Callaghan v. District of Columbia,* 741 F.Supp. 273, 279 n. 14 (D.D.C.1990) (stating that punitive damages are disallowed against the District). Furthermore, no extraordinary circumstances exist to counteract the sound public policy underlying this rule, that "[s]ince punishment is the objective, the people who would bear the burden of the award—the citizens—are the self-same group who are expected to benefit from the public example which the punishment makes of the wrongdoer." *Smith,* 336 A.2d at 832. Third, despite Plaintiff's assertions to the contrary, the evidence does not support the Plaintiff's request for punitive damages against either Defendant, due to the limited purpose for which Paylor's prior harassment claims were admitted; there is an insufficient amount of evidence in the record regarding the District's loss of log books; and the general insufficiency of evidence regarding collaboration between District officials.

### B. LEAVING THE COURT'S VACATUR ORDER INTACT WILL NOT CAUSE MANIFEST INJUSTICE, SO THE COURT SHALL DENY THE PLAINTIFF'S REQUEST FOR A SUBSTITUTE JUDGMENT AGAINST PAYLOR AS AN "AGENT."

■ In her Motion to Alter or Amend, the Plaintiff further requests that the Court substitute judgment against Paylor in his official capacity as an "agent" of the District, and that the $75,000 damage award be deemed added to the Verdict against the District. As cases in this Circuit have consistently held, alteration or amendment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure is proper in limited circum-

---

**5.** At trial, there was testimony revealing a number of vacancies in the Department of Corrections.

stances, and shall be granted where one of three exceptions applies: "an intervening change in controlling law; the availability of new evidence not previously available; the need to correct a clear error to avoid manifest injustice." *Feeling v. Kelly*, 152 F.R.D. 670, 670 (D.D.C.1994) (citations omitted). Only the third exception applies here, and the Plaintiff fails to persuade the Court that "manifest injustice" would occur if the Court denies her request.

In its Vacatur Order of March 24, 1994, due to the apparent lack of a cognizable claim under Title VII against an individual employee in the District, pursuant to 42 U.S.C. § 2000e *et seq.*, the Court vacated its previously-entered Judgment on the Verdict against Paylor, "only to the extent that the Judgment is based on the Jury's response to the Plaintiff's Title VII claim against that Defendant individually." As that Order indicated, in the Court's Final Jury Instructions, the Jury was instructed

> If you find that the Plaintiff has proved one or more of her claims as to one or both of the Defendants, you must determine what amount will fairly and reasonably compensate the Plaintiff for her injuries and damages, but, this must not, in any event, represent double damages. Your Verdict must, as to the damages, be evaluated as to each Defendant separately and independently, but, not be duplicative or allow the Plaintiff to be paid twice for her alleged injuries. You should then return a Verdict with the appropriate damages against each Defendant.

Final Jury Instructions, p. 28, lines 563–70. In following these Instructions, the Jury had ample opportunity to apportion the damages as it saw fit.

Permitting this substitution would allow the Plaintiff to recover twice for the same injury, because "where the employer has been sued directly, it is duplicative to sue the supervisory employees in their official capacities." *See Redpath v. City of Overland Park*, 857 F.Supp. 1448, 1456 (D.Kan.1994); *see also Starrett v. Wadley*, 876 F.2d 808, 813 (10th Cir.1989) (stating that a municipality and a supervisory employee sued in his official capacity "are essentially the same enti-

ty"). In this context, as a variety of circuit courts have noted, "only when a public official is working in an 'official capacity' is that official an 'agent' of the government." *Dirksen v. City of Springfield*, 842 F.Supp. 1117, 1122 (C.D.Ill.1994) (citing *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993); *Miller v. Maxwell's Intern. Inc.*, 991 F.2d 583, 587 (9th Cir.1993); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991); *Harvey v. Blake*, 913 F.2d 226, 227 (5th Cir.1990)). To prevent the possibility of double recovery, and because leaving the Court's Vacatur Order intact will not result in "manifest injustice," the Court must deny the Plaintiff's request to alter or amend the Judgment.

### C. BECAUSE THE PLAINTIFF DOES NOT SEEK ANY FURTHER RELIEF FROM THIS COURT, ALL HER REMAINING CLAIMS SHALL BE DISMISSED.

In her post-trial Motion, the Plaintiff informs the Court that she voluntarily dismisses her claims under Count III and Count V. Additionally, she moves for an entry of judgment on Counts I and II (42 U.S.C. § 1983, Quid Pro Quo Discrimination and Hostile Environment), and Count VII (Negligent Supervision and Selection of Officials), based on the Verdict and Judgment, and the grounds set forth in her Statement of Material Facts As to Which There is No Genuine Issue. Focusing on the fact that these claims would not bring her any remedy, and that any further relief would be redundant or unfounded, the Court hereby dismisses all remaining untried counts.

The Court's dismissal of the Plaintiff's § 1983 and negligent selection and supervision claims is consistent with the intent and purpose of Rule 42(b) of the Federal Rules of Civil Procedure. Under that Rule, a court may bifurcate claims for trial to advance judicial economy, to avoid the possibilities of confusion, to further convenience, to avoid delay and prejudice, and to serve the ends of justice. *See O'Dell v. Hercules*, 904 F.2d 1194, 1201 (8th Cir.1990). In its discretion, and to minimize potential juror confusion in instructing them on several counts of

law, the Court chose to permit the Plaintiff to select her two strongest claims and to try those first.

The Court is well aware that the Rule 42 guarantees the Plaintiff's Seventh Amendment rights for her untried claims, and emphasizes that this dismissal in no way diminishes her right to trial. "If a single issue could be dispositive of the case, and resolution of it might make it unnecessary to try the other issues, separate trial of that issue may be desirable to save to the time of the court and reduce the expenses of the parties." 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2388 (1971). More specifically, further litigation on her § 1983 and negligent supervision claims would be both inappropriate and unnecessary in light of the lack of further *remedies* available to the Plaintiff. In her post-trial motion, she seeks no further compensatory damages, because she presented the Jury with the full slate of her claims, received a sizeable monetary award, and because any further monetary award would constitute double damages. With regard to punitive damages, as stated *supra,* she would not be entitled to them under any cause of action. Therefore, Ms. Webb could not obtain any additional damages by virtue of judgment on additional counts.

Similarly, judgment on the outstanding claims would not provide the Plaintiff with any additional injunctive relief than she is now entitled to under the existing causes as herein provided. She has received virtually all the injunctive relief she has sought, including reinstatement. The one aspect of relief that the Court has denied her—the expungement of AWOL and other disciplinary action from her record—would be of no avail to her because the Court has determined herein that this aspect of her claim for injunctive relief is without merit.

A judgment for the Plaintiff on her § 1983 and negligent supervision claims would bring the Plaintiff only the same damages and injunctive relief that she has already obtained. Therefore, in the interests of justice, fairness, and in an effort to avoid duplicative claims, the Court must dismiss these remaining causes of action. Through the course of litigation, the parties have informed the Court of the existence of other pending litigation in both Superior Court and federal district court, including the class action lawsuit in *Bonds, et al. v. District of Columbia,* Civil Action No. 93–2420, currently before the Honorable Royce C. Lamberth. While it is possible that additional judgments against the District may have some bearing on this other litigation, this Court iterates that it is only concerned with any controversy between the Plaintiff and the Defendants before it in this case. Therefore, because the Plaintiff may not obtain any further relief on the untried counts that would not be duplicative, the Court hereby dismisses them.

## VI. CONCLUSION

The Court finds that neither Defendant is entitled to the entry of judgment as a matter of law, to a new trial, or to a remittitur for the reasons herein articulated. The Court does find, however, that the Plaintiff is entitled to certain injunctive relief, including reinstatement, but that punitive damages are both disallowed and inappropriate here. Because the Plaintiff has obtained more than substantial relief, and because further litigation would not provide the Plaintiff with any additional relief, the Court shall dismiss all remaining claims.

The Court shall enter an Order of even date herewith in accordance with this Memorandum Opinion.

### ORDER

Upon careful consideration of the parties' Motions, Opposition, and Replies, the evidence submitted at trial, the applicable law, the entire record herein, and for the reasons articulated in the Opinion of the Court of even date herewith, it is, by the Court, this 18 day of August, 1994,

ORDERED that Defendant District of Columbia's Motion For Judgment Notwithstanding the Verdict Or, in the Alternative, For a New Trial Or, in the Alternative, For a Remittitur, shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that Defendant Edward Paylor's Motion For New Trial shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that Defendant Edward Paylor's Motion For Judgment Notwithstanding the Verdict shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that the Plaintiff's Motion for Entry of Judgment, to Amend Judgment, and for Additional Relief, shall be, and hereby is, GRANTED in part, and DENIED part, as set forth below; and it is

FURTHER ORDERED that Defendants shall refrain from sexual harassment, sex discrimination, or retaliation of any kind toward the Plaintiff; and it is

FURTHER ORDERED that Counts I, II, III, V, and VII of the Plaintiff's First Amended Complaint shall be, and hereby are, DISMISSED; and it is

FURTHER ORDERED that Defendants shall restore the Plaintiff to an assignment equivalent to her former position in employment as soon as she is medically able, in either the Department of Corrections or another agency within the District of Columbia, and shall ensure that such assignment is free of contact with Edward Paylor; and it is

FURTHER ORDERED that Defendant Paylor, and all others similarly situated, receive sensitivity training in accordance with the Department's stated policy; and it is

FURTHER ORDERED that the parties shall meet and confer in an attempt to resolve all issues regarding attorney's fees, and shall each file a Supplemental Memorandum setting forth all claims supplemental to their previously filed pleadings regarding attorney's fees and costs, on or before 4:00 p.m. on August 25, 1994; and it is

FURTHER ORDERED that the Plaintiff's request for a substitute judgment against Paylor in his official capacity as an "agent" of the District shall be, and hereby is, DENIED, as nugatory.